# RAYMOND H. DART v. REUBEN C. ERICKSON.[1]

## No. 29,442.

## February 24, 1933.

*Daly & Barnard,* for appellant.

*Hallam & Hendricks,* for respondent.

[1]Reported in 248 N. W. 706.

STONE, JUSTICE.

Election contest, summary in procedure, under G. S. 1923 (1 Mason, 1927) § 570, wherein contestant challenges the election of contestee to the office of judge of probate of Meeker county. Decision below was for contestee. Contestant appeals from the judgment.

The election was that of November 8, 1932. Contestant was then in office under appointment from the governor. Contestee carried the election by 1,064 votes. This contest followed because of alleged violation of the corrupt practices act. Shortly before the election all members of the Meeker county bar in active practice signed and published, by handbill and in newspapers, their indorsement of the contestant. Minus caption and signatures, it is copied below.*

A "volunteer committee," championing the cause of contestee, countered by the publication, again in the newspapers and by handbills, of a circular advocating the election of contestee. Its contents will be considered later. Subjoined on its face was a statement that it was "prepared and paid for by volunteer committee in behalf of" contestee. That was not a compliance with the statute, G. S. 1923 (1 Mason, 1927) § 539, which requires "at the head" of any such matter "in pica capital letters the words 'Paid Advertisement,'" and also a statement "of the amount paid or to be paid therefor, the name and address of the candidate in whose behalf the matter is inserted and of any other person, if any, authorizing the

---

*"The office of Probate Judge is of great importance as it requires the exercise of sound judgment and knowledge of law in the probate and settlement of the estates of deceased persons and the important work of the administration of the estates of persons under guardianship. Intricate law must be construed in many of these matters and the undersigned, members of the Bar of Meeker County, Minnesota, sincerely believe that said office should be held by an attorney at law. We, the undersigned, therefore endorse the candidacy of the Hon. Raymond H. Dart, present Probate Judge, and recommend his election. This recommendation is made without any criticism of the other candidate for said office and without intending in any way to reflect upon his integrity or standing."

publication and the name of the author thereof." See also § 544 and Engelbert v. Tuttle, 185 Minn. 608, 242 N. W. 425.

It was found, on adequate evidence, that some 1,500 of the "hand-bills were distributed among the voters of Meeker county by the sanction and approval of the contestee and by and through the agency of his wife and other members of his family." Obviously, both publication in the newspaper and distribution by handbill were to further the candidacy of contestee and influence voting for the office in question within the meaning of the corrupt practices act, § 539. It is found also that the newspaper publication was with contestee's knowledge and consent. He knew what was going on and made no objection except to say that some of the lawyers so roundly denounced were friends of his.

Notwithstanding the facts so found, it was concluded that contestee had "committed no act invalidating his said election, nor has he suffered any violation of the election laws to be done of a character which vitiates, forfeits, or deprives him of his election."

█ That the decision below, while unfavorable to contestee on the facts, was favorable to him on the law, is explained by G. S. 1923 (1 Mason, 1927) §§ 570, 571. Section 571 reads:

"When upon the trial of any action or proceedings under this act it shall appear from the evidence that the offense complained of was not committed by the candidate, or with his knowledge or consent, or was committed without his sanction or connivance, and that all reasonable means were taken by such candidate at such election, or were taken by or on behalf of the candidate, or that the offenses complained of were trivial, unimportant or limited in character, and that in all respects his candidacy and election were free from all offensive or illegal acts, or that any act or omission of any candidate complained of arose from accidental miscalculation or from some other reasonable cause of like nature, and in any case did not arise from any want of good faith, *and under the circumstances it seems to the court to be unjust that the candidate shall forfeit his nomination, position or office, then the nomination or election of such candidate shall not by reason of such offense*

*complained of* [be held] to be void, nor shall the candidate be removed from nor deprived of his nomination, position or office."

As far as there was violation of the law, it was found to have been committed in part by the candidate and altogether with "his knowledge or consent." So it must have been concluded that "the offenses complained of were trivial, unimportant, or limited in character," or that they "arose from accidental miscalculation or from some other reasonable cause of like nature," and that in any event they "did not arise from any want of good faith" of contestee. The clause which we have italicized in our quotation of the statute, permitting a decision for contestee if "it seems to the court to be unjust that the candidate shall forfeit his nomination, position, or office," needs some construction in order to render it constitutional. In deciding election contests courts deal with a political subject matter, one ordinarily beyond their constitutional functions. Griffith v. Bonawitz, 73 Neb. 622, 103 N. W. 327. As far as judicial questions are involved, and no farther, may such matters by statute become constitutionally the subject of adjudication. If the law means that the court must determine for itself who is to have an elective office, on its own ideas of campaign ethics and of what the law ought to be rather than what it is, there would be an unconstitutional delegation of legislative and political power to judges. But we think the law susceptible of a construction which will sustain it. We construe the word "unjust" as synonymous with "unlawful." That means that we must adhere to and enforce the standards of campaign conduct laid down by the corrupt practices act and none other, subject to the qualifications of § 571, to the effect that violations thereof "trivial, unimportant, or limited in character" shall not be ground of forfeiting an election. Conversely, § 570 requires as ground of successful contest "deliberate, serious, and material violation of the provisions of this act or of any other provisions of law relating to nominations and elections."

■ We come now to the circular on behalf of contestee, which is the factual basis for the contest. The portions of it now important are these:

"These lawyers in their attempt to further the cause of their candidate have prescribed for the voters of Meeker County a set of qualifications which candidates for this office should possess and which, if adhered to by voters, would bar any layman from seeking any public office, of any nature in Minnesota.

"IT WOULD BE A REVELATION TO THE VOTERS OF THIS COUNTY, IF WE COULD BUT TEAR ASIDE THE VEIL WHICH' TRULY CONCEALS THE PURPOSE AND AMBITIONS OF THE LITCHFIELD ATTORNEYS WHO BANDED TOGETHER AND PUBLICALLY ENDORSED ONE OF THEIR PROFESSION TO THE ELECTORS FOR THE OFFICE OF JUDGE OF PROBATE.

"POLITICS INDEED MAKES STRANGE BED FELLOWS [capitalized as in original], and this situation would be amusing could we but overlook its seriousness.

"The very foundation of Government lies in the integrity of our courts and the honesty and sincerity of those who administer our laws. We must question the ethics and Americanism of any group who would join together and endorse one of their own number to head a court at which they appear as petitioners representing the meager estates of widows and orphans who have through fate been brought face to face with the harsh realities of life.

"The voters of Meeker County have not IN THE LAST 40 YEARS, been of the opinion that an attorney should control the Probate office and an attorney has not been elected during that time."

Blatantly demagogic in tenor, the question remains whether, within the condemnation of G. S. 1923 (1 Mason, 1927) § 591, the language reflected on the "personal or political character or acts" of contestant. If it did, it was violation of the statute, which is not to be put aside as not "deliberate, serious, and material" under § 570, or as "trivial, unimportant, or limited in character" under § 571. While the corrupt practices act aims to enforce some degree of decency in political campaigns, it does not prohibit libel or slander unlimited of the supporters of the candidate as distinguished from the candidate himself.

The lawyers' endorsement of contestant was altogether truthful and dignified. The answer by the "volunteer committee" for con-

testee, notwithstanding that it seems to have been drawn by a member of another learned profession, was unmeasured vilification of the Meeker county bar. Every aspersion upon them in the circular was unfounded in fact and misleading in the extreme. True, a judge of probate in this state need not be admitted to the bar. So also a county attorney need not be a member of the bar. State ex rel. Knappen v. Clough, 23 Minn. 17. (See also State ex rel. Trebby v. Nichols, 83 Minn. 3, 85 N. W. 717, as to city attorneys, and State ex rel. Froehlich v. Ries, 168 Minn. 11, 209 N. W. 327, as to court commissioners.) But the law notwithstanding, our people have long and everywhere insisted that only a lawyer could be a county attorney. Therein the good sense of the electors has made innocuous the bad sense of the law. We have gotten a long way from frontier conditions. The state has made rapid and substantial development in population, resources, and complexity of business affairs and property rights. That makes it true, at least in counties with such general high degree of business establishment and consequent accumulation of property and property rights as those which characterize Meeker county, that "the office of probate judge is of great importance as it requires the exercise of sound judgment and knowledge of law in the probate and settlement of the estates of deceased persons and the important work of the administration of the estates of persons under guardianship." So far is that true that the interests of the people themselves advise not only that an attorney hold the office, but also that he be well qualified professionally. All lawyers know that and have right to say so. Moreover, they, more than laymen, know the qualifications or lack of them of a candidate for judicial office—just as physicians and surgeons know better than laymen the qualifications for an important work of their profession. Plainly, there is as much reason for choosing a member of the bar for judicial office as there is for selecting a physician or surgeon for membership on a hospital staff.

Of degree only is the difference between a layman in judicial office and another layman as chief of staff of a hospital. Our probate courts are nearer than any other to being legal hospitals. Long

gone is the time when in Ramsey, Hennepin, and St. Louis counties, the three most populous in the state, any candidate for the probate judgeship not a lawyer would have any chance of election. Doubtless the same is true elsewhere. The requirements of a high degree of professional skill in the process of adjudication are too well known and insistent. Of equal importance is the will and the ability to oversee and control the investment of the fiduciary funds subject to probate jurisdiction and searchingly to examine and diligently to watch the bonds given for their protection. In the latter functions some lawyers leave much to be desired in probate matters. But at least they better than laymen know what is and what is not a legally authorized investment for trust funds. Anyone who avers the contrary of these fundamental generalizations, however good his intentions, simply does not understand the problem. But, nevertheless, he has the right to disagree and express his views, however ill-founded or absurd. And, as already indicated, there is nothing in the corrupt practices act which prevents him, if himself not a candidate, from going as far as he likes in vilification of the supporters of a candidate as long as he does not offend § 591 by defaming the candidate himself.

The corrupt practices act is highly penal, not only in imposing the penalties of misdemeanor upon offenses against it, but also in adding, for candidates, that of forfeiture of nomination or office. The necessity for strict construction leads us to agree with the conclusion of the learned trial judge, expressed as follows:

"While it may be said that the article was couched in most reprehensible and unjustifiable language, it cannot be held to reflect on anyone except the lawyers who signed the endorsement. * * * It cannot be held to intend any censure of the contestant, or to contain any reflection bearing upon his integrity or probity either in his individual or official capacity, nor to embrace any false statement relating to him as a candidate."

The "condemned article" is ambiguous. It may be read as suggesting, if not charging, an unethical combination between contestant and his brother lawyers resulting in their being favored.

They are referred to "as petitioners." That of course is false, because they appear in probate court not as petitioners, but as counsel for petitioners. And if competent counsel is ever needed, it is by those interested in "the meager estates of widows and orphans who have through fate been brought face to face with the harsh realities of life." But the language is also open to the view that the meaning intended was not of any combination to which contestant was a party, but only one between the local lawyers to have the office of probate judge, if possible, occupied by a member of the bar. So, while thoroughly reprehensible in content and intended misleading effect, the rule of strict construction of a penal statute which we cannot escape constrains us to hold the document one not "reflecting" on the "personal or political character or acts" of contestant, within the condemnation of § 591.

All this does not get us away from the fact that there was a violation of the statute in that the publication was not labeled as required by §§ 539 and 544, with the names of its authors and the amount they were paying for its publication. Whether that offense, stripped of the element of defamation, was "deliberate, serious, and material," under § 570, or "trivial, unimportant, or limited in character," under § 571, was determined for contestee below. The inquiry involved such consideration of fact, for the decision of which a trial judge of the vicinage is better qualified than we, that his decision will not be disturbed. The elements indicated are not absolute but relative, to be considered in relation to the local conditions developed by the testimony. Of importance in that connection was the substantial majority of votes cast for contestee. The evidence can be so far considered as minimizing the effect of the conceded violation of the statute that, although we might incline to the contrary view if we were trying the facts instead of but reviewing another's decision, we do not feel at liberty to disturb the result.

Judgment affirmed.

OLSEN, JUSTICE, took no part in the consideration and decision of this case.

LORING, JUSTICE (dissenting).

I cannot follow the reasoning that acquits the anonymous authors of the screed before us of deliberate, serious, and material acts calculated to defeat the election of the incumbent of judicial office. The majority see in this paper "unmeasured vilification" of the entire Meeker county bar, of which contestant was a member and for the purpose of the attack the most important member. No intelligent voter could read this publication and understand it to charge less than a conspiracy to enrich the members of the bar at the expense of the widows and orphans of the county. Such a conspiracy could not be effective without the coöperation of the incumbent of the office of the judge of probate. This contestant then held that office. No voter could distinguish between what was expected of contestant and what he had already done during his tenure. The irresistible implication of the language used charges lack of "integrity," "honesty, and sincerity" to contestant in the administration of his office. It assails his "ethics and Americanism." And it leaves no doubt in anyone's mind about his inclusion in its charges by alleging that the maligned group got together and endorsed "one of their own number" for judge of probate. Here was no mere vilification of contestant's supporters. The screed attacked the judge himself. No ordinary person would see ambiguity in these charges. He would see just what was intended, a direct attack on the judge, who was the real target of the abuse. The anonymous authors were not seeking to defeat the bar. They were aiming at the judge. No one could misunderstand that. The charges made were skilfully preceded by an appeal to prejudice wholly unfounded in fact. The desirable qualifications for judge of probate as set forth by the lawyers' endorsement did not apply to all other offices as charged. I think the contestee, with whose "knowledge or consent" these charges were published and circulated, should forfeit his office.

WILSON, CHIEF JUSTICE (dissenting).

I concur in the dissent.

322

On June 5, 1933, the following opinion was filed:

PER CURIAM.

On reargument the former opinion is adhered to.