HENRY H. BANK v. EDWARD J. EGAN.[1]

October 2, 1953.

No. 36,176.

[1]Reported in 60 N. W. (2d) 257.

*Harry H. Peterson,* for appellant.

*William H. DeParcq* and *Donald T. Barbeau,* for respondent.

KNUTSON, JUSTICE.

Appellant and respondent were opposing candidates for the office of alderman from the fifth ward of the city of Minneapolis at the general election held on June 8, 1953. Respondent received a plurality of 110 votes in the election. Thereafter, this proceeding was commenced by appellant seeking to have the election of respondent declared void for a violation of M. S. A. 211.08 of our corrupt practices act. The contest is based on the circulation of two exhibits, A and B, alleged by appellant to be false and a violation of the act. The trial court found that the facts stated in the exhibits were not false and that there was no material violation of the act. This appeal followed.

The material portion of § 211.08 reads as follows:

"* * * any person, firm, corporation or committee who shall knowingly make or publish or cause to be published, any false statement in relation to any candidate or proposition to be voted upon, which statement is intended to or tends to affect any voting at any primary or election, shall be guilty of a misdemeanor; * * *."

A proceeding brought to avoid an election for a violation of this statutory provision is authorized by § 208.01. Such proceeding is a special proceeding (Ford v. Wright, 13 Minn. 480 [518]) but is tried as a civil action (Hanson v. Emanuel, 210 Minn. 51, 297 N. W. 176), and the usual rules governing the trial of such actions prevail. Miller v. Maier, 136 Minn. 231, 161 N. W. 513, 2 A. L. R. 399; Hawley v. Wallace, 137 Minn. 183, 163 N. W. 127. On appeal, findings of fact of the trial court are entitled to the same weight as in any civil action and will not be reversed where the requisite support is found in the record.

The corrupt practices statute is directed against false statements of fact. It does not forbid criticism of a candidate, even though unfair and unjust, if based upon facts which are not false. Hawley v. Wallace, supra. Acts of the candidate which are not serious or material but which are immaterial and trifling are not

grounds for avoiding an election. Saari v. Gleason, 126 Minn. 378, 148 N. W. 293; M. S. A. 208.01 and 211.34.

■ As in other civil actions, the burden rests on the petitioner to prove the allegations of his petition by a fair preponderance of the evidence. More absence of proof will not support a finding which is the basis for declaring an election void.

■ There is some dispute as to the proper construction of our statute with respect to the use of the word "knowingly." The question raised is whether the word "knowingly" refers to the act of publishing or causing to be published the statements complained of or whether it refers to knowledge of the falsity of the statement published. Respondent candidly admits that he took part in the preparation of the exhibits and authorized their circulation, so there is no doubt in this case that he knowingly published or caused the exhibits to be published. We believe, however, that the correct interpretation of the statute requires us to hold that the word "knowingly" refers to the falsity of the statement and that, to find a violation of the statute, it must be determined that the violator knew that the statement published was false.

This conclusion is fortified by the language used in § 208.01, where it is provided that the nomination or election of the person may be avoided for a "deliberate, serious, and material violation of the provisions" of the act. Likewise, § 211.34 contains the provision that an election shall not be avoided where the offenses complained of are trivial or unimportant or where the "act or omission of any candidate complained of arose from accidental miscalculation or from some other reasonable cause of like nature, and in any case did not arise from any want of good faith." It is obvious that when it is shown that a statement was published or caused to be published by a candidate it must follow that it was knowingly done. Use of the word "knowingly" in connection with the publication or act of causing a statement to be published would be entirely unnecessary. The act of publishing or causing to be published in itself presupposes knowledge of the act. Wisconsin Stat. 1951, § 12.17, is identical with ours for all practical purposes. In State

ex rel. Hampel v. Mitten, 227 Wis. 598, 607, 278 N. W. 431, 435, the Wisconsin court said:

"Under this section the person making the statements referred to must have known them to be false."

We believe that this is the proper construction of our statute.

■ Many of the statements contained in the two exhibits are supported by the evidence to such an extent that the court's findings that the statements are not false are clearly sustained. We shall discuss only those which appear to us to be on the border line.

One of the cartoons depicts a man, purportedly appellant, standing before an individual, supposedly resembling a judge, saying: "I refuse to waive my privilege against self-incrimination." Below the picture we find the statement: "Egan's opponent refused to testify in the grand jury probe of racketeering in Minneapolis last fall." The evidence shows that appellant was called before the federal grand jury in such investigation. When asked if he would waive his immunity, he stated that he would reserve decision on that matter until a later time. His main objection to the cartoon is that he did not in fact appear before a judge. He also claims to have "responded" to all questions put to him but would not say that he had answered them. He now contends that to respond and to answer are the same. We do not agree. He might respond by evading the question or by refusing to answer it at all. The picture of the judge is symbolic only, and we cannot see that it would be material whether the picture showed him appearing before a judge or the grand jury. The implication, as well as the statement under the picture, is that he refused to waive his immunity before the grand jury. The evidence sufficiently sustains the finding of the truth of this assertion in all material matters.

Another picture shows three feminine characters being loaded into what is obviously a patrol wagon by two officers. Two men appear to be running after the patrol wagon, or the characters involved, in front of Smitty's Bar. As part of the picture we find these words: "When this notorious underworld spot was raided

recently, who rushed to the aid of the 'girls' taken in? The proprietor and Egan's opponent for the city council seat." The evidence shows that a raid was made on Smitty's Bar on or about March 25, 1952, and that as a result seven women were taken to police headquarters, where four were held, according to a newspaper story in the Minneapolis Tribune of that date. Shortly after the raid, Mr. Smith, who was proprietor of Smitty's Bar, called appellant at his home, according to the cross-examination of appellant. Appellant appeared at police headquarters within a matter of an hour or two, together with Mr. Smith, and he did represent the women involved. About the only objection made to the cartoon is that the women were in fact taken to police headquarters in squad cars instead of a patrol wagon, and it is claimed that therefore the statement is false. This slight deviation from the truth is insufficient to constitute a violation of the act.

Appellant also contends that there is no showing that Smitty's Bar was an underworld spot and that there is no underworld in the city of Minneapolis. A report of the morals squad of the Minneapolis police department shows that since June 21, 1947, the vice squad alone had made 62 arrests, with 61 convictions, for morals violations arising out of contacts made in Smitty's Bar. A break down of these violations was shown and included common prostitution, 18; disorderly conduct, 9; vagrancy, 15; false hotel registration, 8; lewd and indecent conduct, 9; violation of floater parole, 1; and pandering, 1. The report also shows that, in addition to the arrests made by the morals squad, many other arrests had been made by the police department, many of them for felonies, where Smitty's Bar was named as the contact spot for the crime. The report further states that there can be no doubt that the licensee, Smith, knew that prostitutes loitered in his bar for the purpose of making contacts with the customers. There were other statements of a like nature in the report.

The term "underworld" has a variety of meanings. Webster's New International Dictionary (2 ed.) (1947) gives, among others, the following definition: "the lower, debased, or criminal, portion

of humanity." We believe that the word is generally understood to mean all those who live on the fringes of organized and legal society, and certainly, giving the word a liberal construction, the statement that Smitty's Bar was a famous underworld spot is not unjustified. The record also shows that the license issued to Smitty's Bar was later revoked by the city council on account of the unsavory condition existing there. Clearly, the evidence in this respect amply supports the court's finding that the reference to Smitty's Bar was not false.

There are other statements contained in exhibit A, but we believe that with respect to those which have not been discussed herein the evidence sufficiently sustains the court's findings that they were not so false that they should be considered a violation of this act.

Exhibit B consists of a drawing purporting to be three ghosts, one representing a grand jury investigation; the second, an income tax quiz; and the third, liquor licenses. Underneath we find the statement: "Why our alderman has nightmares at election time!" The balance of the exhibit consists of reprints of various newspaper articles. We have already commented upon the grand jury investigation and the reference of respondent to appellant's failure to waive immunity before the grand jury.

The ghost of liquor licenses has reference, we assume, to appellant's practice of representing those who were interested in such licenses. The record shows that, while serving as alderman, appellant, who is an attorney at law, either acted directly for, or referred to associates in his office, numerous applicants for beer and liquor licenses and that he was paid a fee by many of those he represented himself and a referral fee in connection with those referred to others. We believe that the inference to be drawn from this ghost is fair comment. The practice of representing those who are interested in procuring beer and liquor licenses from a council of which he is a member is one which surely justifies fair criticism in a political campaign.

With respect to the reprint of newspaper articles, which dealt largely with the grand jury investigations in which appellant ap-

peared, we believe that the record sufficiently sustains the court's finding. In one reprint, a part of the article was deleted. While it may have been an unfair act to do this inasmuch as the deleted part might have tended to take the "sting" out of the balance of the article, we fail to see that it had the effect of making the part reprinted false, and appellant has not shown that it had that effect. Furthermore, at the most it only left the inference that appellant had refused to waive immunity before the grand jury, and we believe that his own testimony sustains a finding to that effect.

With respect to the reference to an income tax quiz, the record shows that appellant was required by an order of the trial court in this proceeding to produce his income tax reports and all letters with the internal revenue bureau for a period of ten years. He did produce the reports for five years but claimed that he could not produce the records for the other five years. He was then requested to give his consent to an inspection of the records in the office of the department of internal revenue, which he refused to do. Under the rules of the department of internal revenue, such inspection could not be made without his consent. It was the right of appellant to refuse to give his consent to such examination. However, it can hardly be said that his refusal to permit an inspection of the records which might have determined the truth or falsity of the statement which he complained of sustains his burden of proving such falsity. He alone had the right to permit an examination of the records involved. If refusal to do so does not permit an inference that the statement was true, it does justify a finding that he had failed to sustain the burden resting upon him of proving its falsity. In a proceeding of this kind the least that should be asked of the complaining party is complete candor and co-operation in arriving at the truth of the matter.

We have not attempted here to analyze in detail all parts of the exhibits; to do so would unduly add to the length of this opinion without serving any useful purpose. It is sufficient to say that we have carefully examined the entire record and are of the opinion that the court's findings are sufficiently supported so that there

should be an affirmance. Where there are slight deviations in the statements made from the facts shown to be true, they are not so important that they should be considered a violation of this act, particularly in view of the court's findings to the contrary.

Other assignments of error deal largely with the admissibility and use of the grand jury report and the newspaper articles based thereon. It is appellant's contention that these reports and articles were hearsay and therefore inadmissible. The grand jury report was not admitted in evidence but was used to show that the newspaper articles were consistent with the report. Neither was admissible for the purpose of proving the truth of the statement therein contained, but they were properly used to show that the statements were made. The burden of proving the falsity of the statements made by respondent rested upon appellant. We find no error in the use of the grand jury report or newspaper articles for the limited purpose of showing their publication.

We have examined the authorities cited by appellant. It would serve no useful purpose to attempt to reconcile or distinguish these cases. It is enough to say that each case of this kind must stand on its own facts. Where, as here, it is evident that the statements made, or reasonable inferences which can be drawn from cartoons or pictures, are true in material matters, slight deviations or the fact that a few might draw unwarranted inferences from the pictures is not enough to avoid an election. It is quite evident from an examination of M. S. A. 211.34 that the legislature intended to grant the trial court considerable discretion in determining whether violations of the act are trivial or unimportant and whether under the circumstances of the particular case it would be unjust that a candidate forfeit his office. Unless it appears that there has been a clear abuse of discretion we should not reverse merely because it appears that there has been a violation which is technical rather than real. Here, we believe that the court was justified in finding that the statements complained of were in all material respects true and that the deviations from the truth were trifling and unimportant.

■ Appellant also contends that the court erred in permitting the witnesses to explain their answers. It was appellant's contention at the time of the trial that some of the witnesses should be compelled to answer categorically "yes" or "no." The court in several instances refused to require a witness to answer a question by a simple "yes" or "no." It was well within the discretion of the trial court to do so. Many questions cannot fairly be answered by "yes" or "no." The trial judge is entitled to considerable latitude in determining whether a witness should be allowed to explain his answer. We will not reverse unless there is a clear abuse of discretion in the exercise of this right which results in prejudice to the opposing litigant. We find no abuse of discretion in that respect here.

While we affirm because we conclude that we must do so on the record before us, we must emphasize that we do not place our stamp of approval on the type of campaign shown here. The trial court has found that the acts complained of are insufficient to constitute a violation of the corrupt practices act. We affirm because, under ordinary rules of practice, we find the evidence sufficient to sustain the court's findings. Had appellant been more candid in assisting the court in arriving at the facts, the result might well have been otherwise. At the same time, we cannot condone practices in a campaign for an important political office which come so perilously close to constituting a violation of the spirit if not the letter of the law. Our corrupt practices act is intended to insure fair election of candidates to office of honor and trust based upon campaigns of decency. While a campaign may be vigorous and the public is entitled to know the facts about a candidate, it should not be necessary to indulge in practices which cannot help but destroy public confidence in all public officials and which necessarily result in loss of confidence in both candidates for the office involved.

We have examined all other assignments of error and questions raised by the appeal, but it would serve no useful purpose to further extend this opinion. The judgment of the trial court should be affirmed.

Affirmed.