Argued May 24, affirmed June 28, reconsideration denied
August 6, petition for review denied September 24, 1974

STATE ex rel STATE GAME COMMISSION
et al (No. 72-1265-L), *Appellants, v.* GOLD
HILL IRRIGATION DISTRICT, *Respondent.*

523 P2d 1287

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Patrick Ford,* Medford, argued the cause for respondent. On the brief were Robert L. Cowling and Ford & Cowling, Medford.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

## FORT, J.

Plaintiff, Oregon State Game Commission, brought an action for damages under ORS 496.705 against Gold Hill Irrigation District arising from the intentional release by defendant of a quantity of a petroleum-related product into one of its water canals. Upon the overflow of the canal, the product ultimately passed, via a tributary, into the Rogue River killing several thousand steelhead fry. The court granted a judgment of involuntary nonsuit, and the Game Commission appeals.

Defendant released Chevron Aquatic Solvent 3501 into its irrigation canal for the purpose of destroying moss. The spillways from the canal were closed prior to the release in order to keep the chemical within the canal. One screen and headgate, discovered to be jammed, were repaired prior to the release. Following the release, defendant discovered that another fish screen had jammed and water was overflowing one headgate in the vicinity of Kane Creek. The overflow, which entered the Rogue River via Kane Creek, ultimately killed some 4,500 steelhead fry. No testimony was adduced to show that defendant intended that the chemical was to be used in game waters, nor that it had reason to believe at the time the solvent was released into its canal water that it would ever reach any of the state's game waters in lethal or even dangerous concentrations.

We note initially that the Game Commission does not here contend nor is there any evidence that the irrigation district either intended or was aware at the time it placed the solvent in its canal water that killing of fish would in fact result therefrom. It was aware and conceded in its brief that it knew that the solvent would kill fish if introduced into Kane Creek or any other game fish waters. Had the canal water not overflowed the headgate, there was no evidence that fish in the creek or river would have been killed or that the contaminated canal water would have reached game waters.

As originally filed, the Game Commission asserted its right to bring this action under ORS 496.705 as well as under former ORS 449.159, now ORS 468.790 (1).

ORS 468.790 (1), renumbered from ORS 449.159, provides:

"(1) Any person owning oil[①] or having control over oil which enters the waters of the state in violation of ORS 468.785 shall be strictly liable, without regard to fault, for the damages to persons or property, public or private, caused by such entry. * * *"

ORS 468.745 (3), renumbered from ORS 449.103 (3), provides:

"Any action or suit for the recovery of damages described in subsection (1) of this section shall be brought in the name of the State of Oregon upon relation of the department or the Attorney General. Amounts recovered under this section shall be paid to the state agency having jurisdiction over the fish or wildlife or fish or wildlife production for which damages were recovered."

At the time of the 1972 Act here involved, ORS 496.705 (1) and (5) provided:

"(1) The game commission may institute suit for the recovery of damages for the knowingly unlawful killing of any of the game birds and animals and salmon, steelhead and trout which are the property of the state.

"(5) Such civil liability shall be in addition to other penalties as prescribed by this Act, as defined by subsection (2) of ORS 496.025, for the unlawful killing of game birds and animals and fish."

■ The court sustained a demurrer to the cause of action based on ORS 468.790 (1) on the ground that only the Environmental Quality Commission had authority under ORS 468.745 (3) to bring an action thereunder in the name of the state. That ruling is not

---

① It is conceded here that the substance, Chevron Aquatic Solvent 3501, used by the irrigation district was an "oil" within the definition of ORS 468.790 (1).

assigned as error. This action then continued under ORS 496.705 alone.

Examination of the statutory history of Oregon Laws 1969, ch 302, § 1, now ORS 496.705, shows clearly that in 1969 it was the intent of the sponsor, Izaak Walton League, to seek recovery for the unlawful killing of game fish in state waters by dynamiting or poisoning by both resident and non-resident fishermen.

Prior to the 1969 amendment, Oregon Laws 1969, ch 302, § 1, the statute simply said:

"(1) The game commission may institute suit for the recovery of damages for the unlawful killing of any of the game birds and animals which are the property of the state."

Comparison of the statute before and after the 1969 amendment shows that the legislature limited the right of recovery to a claim based on a *"knowingly*[2]

---

[2] "Mr. Denman [appearing for the Izaak Walton League] said that he was the original author of HB 1750, and drafted it out of concern over a gap in the law which was made apparent in the summer of 1968. He said that there had been instances in southern Oregon, one of which was the dynamiting of many adult summer steelhead in the North Umpqua River, and after a long and lengthy investigation it turned out that two Oregon residents were implicated and two State of Washington residents.

"*Senator Ouderkirk* suggested an amendment. In line 6, after 'the' insert 'knowingly' or 'willfuly [sic]'.

"*Mr. Denman* agreed that such an amendment would certainly accomplish the purpose and he would not have any objections to it.

"*Mr. Holloway* [appearing for the State Game Commission] said that he didn't feel that he could strengthen Mr. Denman's testimony. He commented upon the use of the word 'willfully' being inserted. He felt this would be fine except where there might be a dam under construction and by negligence a lot of fish were killed—this would be a negligent act—not willful. He added that the Game Commission does favor the bill but he agreed that an amendment would improve it." Senate Fish & Game Committee Minutes, p 2, May 2, 1969.

unlawful killing" (emphasis supplied) of the stated animals by the 1969 amendment. Such an amendment not only provided a major modification of the prior law but one in marked contrast to the "strict liability without regard to fault" imposed by ORS 468.790 (1).

■ Essentially then, the question presented is what standard does the phrase "knowingly unlawful killing" import as used in ORS 496.705 (1)? The Game Commission contends it simply imports a standard of negligence. The irrigation district contends that it imports a standard of intent to cause a killing of fish.

As used in the statute, "knowingly" is an adverb modifying the adjective unlawful. It is not here contended that the act of putting the solvent into the canal water was itself unlawful. It is conceded that neither the district nor its employe who actually released the solvent had any intention by so doing to kill any fish in the state's game waters.

Although in a different context, in *Siuslaw Timber Co. v. Russell,* 91 Or 6, 9-10, 178 P 214 (1919), the Supreme Court had occasion to consider the treble damage provision (Sections 346, 347, L.O.L.) for cutting timber on the land of another and the meaning of the word "knowingly" in connection therewith. It said:

> "The interpretation of these sections, by this court, will be found in the case of *McHargue v. Calchina,* 78 Or. 326 (153 Pac. 99), wherein it is held that in order to justify a judgment for treble damages the plaintiff must plead and prove that the acts of which he complains were willfully committed. *In statutes of this nature, the word 'willfully' is synonymous with 'knowingly'*: *Fry v. Hubner,* 35 Or. 184 (57 Pac. 420) ; 8 Words & Phrases, 7474. \* \* \*" (Emphasis supplied.)

In *State ex rel Nilsen v. Lee,* 251 Or 284, 293, 444 P2d 548 (1968), the Supreme Court, though involving a different statute, discussed the meaning of the word "wilfully" and said:

"ORS 652.150 authorizes the imposition of a penalty only if the employer *wilfully* fails to pay his employee's wages. An employer acts wilfully if, having the financial ability to pay wages which he knows he owes, fails to pay them. * * *"

*See also* n 2 of this opinion where it appears that "knowingly" may well have been considered as synonymous with "wilfully" at the time it was put into the statute here involved.

Both parties rely on *American Timber & Trad. Co. v. First Nat. Bank of Oregon,* 334 F Supp 888, 889-90 (D Or 1971) as support for their construction of the statute here involved. There the court said:

"The legislative intent in enacting usury laws is to protect borrowers from paying excessive interest. Usury legislation is a form of consumer legislation. It should be construed with regard to its net effect upon the borrower rather than upon the bookkeeping burden, customs, or convenience of the lender.

"Since I hold that the use of the 360-day year in computing interest at the ceiling, or maximum, legal rate violates local law, the practice automatically violates 12 U.S.C. § 86, unless the court can say the excessive interest was not exacted 'knowingly.'

"The word 'knowingly' ordinarily means that the act or omission was intentional. It is not necessary that the actor intended to break the law. It is enough that he intended the act. One may be ignorant of the law, and yet be found to have violated its demands. United States v. International Minerals & Chemicals Corp., 402 U.S. 558, 91 S. Ct. 1697, 29 L. Ed. 2d 178 (1971).

"Here, it is agreed that the bank knew that its computation of interest on the 360-day year would result in a borrower paying more in one year than the maximum legal rate when computed on a calendar year. * * *"

Nothing in that opinion supports plaintiff's contention here that ORS 496.705 (1) creates a standard of civil liability based on ordinary negligence. It simply stands for the proposition that violation of the usury statute there involved required proof that the action intended to accomplish the proscribed result—the charging of interest in excess of the maximum lawful rate. Such proof was amply there supplied, as the court found. Here there was no such proof.

*Bank v. Egan,* 240 Minn 192, 60 NW2d 257 (1953), involved a proceeding brought by a defeated candidate to reverse an election due to alleged violations of the state Corrupt Practices Act. Plaintiff alleged his opponent violated M.S.A. § 211.08, which provided, in part:

"'* * * [A]ny person * * * who shall knowingly make or publish or cause to be published, any false statement in relation to any candidate * * * to be voted upon, which statement is intended to or tends to affect any voting at any primary or election, shall be guilty of a misdemeanor; * * *.'" 60 NW2d at 258.

Though penal in nature, the statute in *Bank* was being used in a civil proceeding—the attempted reversal of an election result. An issue was whether "knowingly" in the statute referred simply to making of the statement or the falsity of its content. The court determined that the latter was the meaning, stating:

"* * * We believe, however, that the correct interpretation of the statute requires us to hold

that the word 'knowingly' refers to the falsity of the statement and that, to find a violation of the statute, it must be determined that the violator knew that the statement published was false." 60 NW2d at 259.

Thus the court held the actor must not only know the statement is being made, but that it is false to constitute a violation of the statute.

■ There was insufficient evidence to support a conclusion that defendant knew when it put the aquatic solvent into its canal water that that act would result in killing the steelhead fry or that such result was "substantially certain to follow."[9] Therefore, the trial court correctly granted the motion for involuntary nonsuit.

In the view we have taken, we find it unnecessary to consider the remaining assignments of error.

Affirmed.

---

[9] Prosser, Torts 31, § 8 (hornbook series, 4th ed 1971), points out:

"Intent, however, is broader than a desire to bring about physical results. It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does. * * *"