In the Matter of the Contest of General Election Held on November 7, 1978, for the Purpose of Electing a State Representative in the Counties of Ramsey and Dakota, State of Minnesota.

James SCHEIBEL, et al., contestants, Appellants,

Thomas Quinlan, et al., contestants,

v.

Robert PAVLAK, contestee, Respondent.

No. 49713.

Supreme Court of Minnesota.

May 11, 1979.

Leonard & Weinblatt and Alan W. Weinblatt, St. Paul, for appellants.

O'Neill, Burke & O'Neill and Patrick H. O'Neill, St. Paul, Michael J. Bolen, Edina, for respondent.

SHERAN, Chief Justice.

This is an appeal from an order of the District Court of Ramsey County dismissing proceedings instituted by voters residing in House of Representatives District 67A to contest the election of Robert Pavlak to the office of representative in that district on November 7, 1978. Contestants charged Mr. Pavlak with knowingly permitting the distribution of a campaign brochure on his behalf which contained false information with respect to the voting and attendance record of the incumbent, Arnold Kempe.

District 67A of the Minnesota House of Representatives consists of eight precincts in St. Paul proper, Ramsey County, and four precincts in West St. Paul, Dakota County. Mr. Pavlak was elected to that office in 1966, 1968, 1970 and 1972 as an Independent-Republican. In 1974 Mr. Kempe, running as a member of the Democratic Farmer Labor Party, defeated Mr. Pavlak by 200 votes and retained that office until the November 7, 1978, election when Mr. Pavlak was again his opponent. Early in October, 1978, Mr. Pavlak was invited to an interview by William G. Sumner, Editor of the *St. Paul Dispatch.* Mr. Pavlak brought with him to that interview records which he had compiled of Mr. Kempe's attendance and his roll call voting absences in the House of Representatives during the years 1977 and 1978. Those records showed that Mr. Kempe missed over 300 roll call votes during that period. Mr. Sumner was provided with a photostatic copy of the research done by Mr. Pavlak and was warned by Mr. Pavlak that there might be errors in his computation.

Several weeks later on Saturday, November 4, 1978, about 8:00 a. m. Mr. Pavlak read the editorial in the *St. Paul Pioneer Press-Dispatch* which stated in part: "We have seen nothing to dispute his [Mr. Pavlak's] research report that shows the incumbent voted four times in 1967-68—this out of more than 300 opportunities." Mr. Pavlak immediately called the *Dispatch,* was unable to reach Mr. Sumner but advised the city desk that there was an error in the editorial.

The actual error in the editorial was the claim that Mr. Kempe participated in only four out of 329 roll call votes in two sessions, whereas he had cast 1,469 roll call votes and missed only 329. This, however, was not the error which Mr. Pavlak wished to call to Mr. Sumner's attention. The error which he wished to call to Mr. Sumner's

attention was the fact that the editorial referred to the year 1967-68 rather than 1977-78. It was also his intention to secure an explanation of the editorial's reference to Mr. Kempe's four votes out of 300 opportunities which Mr. Pavlak stated he did not understand and no one at the paper was available to explain. He left his name and number so that Mr. Sumner could call him back.

Although Mr. Pavlak did not understand the editorial's reference to four votes out of 300 opportunities, he testified that he accepted that information because he believed the newspaper "was privileged to know something" that he did not know. Although he had not furnished Mr. Sumner with that information he relied on the fact that the newspaper had a staff of editorial writers and reporters to do their own research.

Between 9:00 a. m. and 10:00 a. m. on Saturday, November 4, Mr. Pavlak's campaign manager, James Aydt, called and, characterizing the editorial as an endorsement, asked Mr. Pavlak whether it should be reprinted. Mr. Pavlak referred him to Robert Larson who was handling the preparation of campaign literature, pointing out that there was an error with respect to the paper's reference to the years 1967 and 1968. He did not discuss the editorial's reference to four votes out of 300 opportunities. Mr. Aydt thereupon called Mr. Larson and discussed the editing, reprinting and distribution of the editorial. They agreed on the marginal statement "Even with the papers 'typo' the message about our opponent is clear!" The typographical mistake to which Mr. Aydt referred in that conversation was the wrong year. Mr. Larson, on the other hand, testified that the only mistake he was flagging was the fact that the editorial credited Mr. Kempe with four votes and Mr. Larson thought Mr. Sumner actually meant by that particular statement "No times, this out of more than 300 opportunities" because the whole thrust of the campaign, Mr. Larson stated, ultimately boiled down to the 300 missed votes. In short, there is no evidence that either Mr. Pavlak, Mr. Aydt or Mr. Larson intend-

ed to alert the public to the possibility that the statement concerning Mr. Kempe's voting record might be false.

That afternoon Mr. Aydt took the editorial with the marginal comment and the relevant paragraph circled in ink for reprinting. He had 6,000 copies prepared and available by 5:30 p. m., at which time he delivered them to Mr. Pavlak.

Between 5:30 p. m. Saturday, November 4, and 8:00 p. m. on Monday, November 6, between 1,800 and 1,900 reprints and other materials were distributed in three St. Paul precincts and two West St. Paul precincts, including several hundred placed on the windshields of cars of those attending four area churches on Saturday afternoon and Sunday morning.

On Monday, November 6, a second editorial appeared in the *St. Paul Dispatch* stating—

"* * * we erred in our endorsement of Robert Pavlak, IR, who is seeking to unseat Rep. Arnold Kempe in 67A. Pavlak's research report stated Kempe voted four times during the years 1977-78, not, as incorrectly reported, 1967-68."

Mr. Kempe testified that he read the November 6 editorial in the evening *Dispatch,* which prompted him to find and for the first time read the editorial in the November 4 *Dispatch.* At 5:30 p. m. Monday he called Mr. Tom Carlin, the publisher, and advised Carlin that the editorial was a fraud, that the reporters knew it was wrong and demanded an immediate retraction. That same evening, David Nitti, Mr. Kempe's campaign manager, brought to Mr. Kempe's home a package of Mr. Pavlak's campaign material which included a copy of the edited November 4 editorial. Mr. Kempe testified that to the best of his recollection this was the first time he had seen it. Although Mr. Kempe could not recall having read the original editorial on November 4, and testified that he rarely read the editorial page, three of his campaign workers testified that they had called Mr. Kempe's attention to the editorial on Saturday the 4th and Sunday the 5th.

David Nitti stated that he met Mr. Kempe on the street on Saturday and Mr. Kempe had expressed the opinion that the endorsement of Mr. Pavlak was damaging. Mr. Nitti told Mr. Kempe that the paper misrepresented Mr. Kempe's voting record.

James Scheibel, one of the contestants, was not sure what day he had spoken to Mr. Kempe about the November 4 editorial but was of the opinion it could have been on Sunday the 5th. Thomas Quinlan talked to Mr. Kempe Saturday morning the 4th, after seeing the endorsement in the morning edition of the *Dispatch,* and testified "We probably did discuss the error in the newspaper concerning the voting record, too." It is the contention of the respondent that having knowledge of the November 4 editorial on the day it appeared, it was Mr. Kempe's duty to mitigate the damage by immediately demanding a retraction. Not having done so, it is argued that Mr. Kempe himself regarded the editorial as being neither a serious nor a material violation of the election law.

On Tuesday, November 7, 1978, Mr. Pavlak was elected by a margin of 321 votes, 4,454 to 4,133.

On November 24, 1978, a group of District 67A voters brought suit to vacate the election on the grounds that the reprint contained "false information" within the meaning of section 210A.04 of the Minnesota election law.[1] According to Minn.St. 209.02, any violation of an election law provision such as § 210A.04 is grounds for nullifying an election if it is "deliberate, serious, and material."[2]

From December 4 through December 7, the parties, acting pursuant to Minn.St. 209.02, subd. 4a,[3] chose a mutually acceptable district judge to hear the case by striking off names of available judges until one remained. Judge Robert Breunig of the First Judicial District was selected.

Trial was held during the end of December, 1978, and the trial judge issued his dismissal of the contest on January 2, 1979.

1. Minn.St. 210A.04, subd. 1, provides: "Every person who writes, prints, posts, or distributes, or causes to be written, printed, posted, or distributed, except by broadcasting, any circular, poster, or other written or printed matter containing false information with respect to the personal or political character or acts of any candidate, which is designed or tends to elect, injure or defeat any candidate for nomination or election to a public office, shall be guilty of a gross misdemeanor."

2. Minn.St. 209.02, subd. 1, provides: "Any voter, including a candidate, may contest the nomination or election of any person for whom he had the right to vote, who is declared nominated or elected to the senate or the house of representatives of the United States, to a state, county, legislative, or municipal, or district court office, or the declared result of a constitutional amendment or other question voted upon at an election by proceeding as provided in this chapter. The contest may be brought over an irregularity in the conduct of an election or canvass of votes or on the grounds of deliberate, serious, and material violations of the provisions of the Minnesota election law."

3. Minn.St. 209.02, subd. 4a, provides: "In legislative contests, notice of contest shall be filed and served as provided in subdivisions 2 to 4, except that the clerk of district court with whom the notice, and answer, if any, has been filed shall, within three days of receipt of each, submit by certified mail one copy thereof to the chief justice of the supreme court. Upon receipt of the notice of contest, the chief justice shall, within five days, submit to the parties a list of all the district judges in the state, having stricken any judges involved in a trial with which serving as judge in the election contest would interfere and having stricken the name of any judge whose health precludes service as judge in the election contest. The parties shall within two days after receiving the list of judges meet together and, in cases where an unfair campaign practice is alleged, by alternating strikes remove the names of all judges until but one remains who shall then proceed to hear the contest in the manner provided in section 209.10. In cases where no unfair campaign practice is alleged, the parties shall follow the same procedure using only the names of judges of the judicial district or districts covering the area served by the contested office. The judge shall, within 15 days after notice has been filed, convene at an appropriate place within the county, or, if the district includes all or portions of more than one county, a county within the legislative district and hear testimony of the parties, under the ordinary rules of evidence for civil actions. If the contestant does not proceed within the time provided for herein his action shall be dismissed and the judge shall transmit a copy of his order for dismissal to the chief clerk of the house of representatives or the secretary of the senate, as appropriate."

The contestants appealed on January 12, 1979, as provided for by Minn.St. 209.09.[4] According this case the expedited consideration required by Minn.St. 209.09, this court heard oral argument on March 5, 1979. The argument was primarily on the merits of the case; the parties did not brief nor argue directly the constitutional propriety of this court acting in this matter. However, research conducted by the court in its subsequent consideration of the case revealed a substantial issue of whether the court was free to take any action at all. Accordingly, the court issued its order of April 26, 1979, providing the parties an opportunity to present their views on the question. This hearing was held on May 3, 1979.

■ I. To begin with, there is no question of the Legislature's final authority in this matter. The constitutional directive is explicit:

> "Each house shall be the judge of the election returns and eligibility of its own members." Minnesota Constitution, Article IV, Section 6.

The privilege of a legislature to judge the eligibility of its own members is longstanding, dating back to 1586, when the House of Commons resisted an attempt by the Crown to have the Lord Chancellor determine a member's qualifications.[5] This legislative prerogative has been universally adopted in America, and now every state constitution contains a provision similar to Minnesota's Article IV, Section 6.[6] There are good reasons for such widespread acceptance of the principle, often framed in terms of legislative self-protection. Judge Story's comment is illustrative:

> "It is obvious, that a power must be lodged somewhere to judge of the elections, returns, and qualifications of the members * * *. The only possible question on such a subject is, as to the body, in which such a power shall be lodged. If lodged in any other, than the legislative body itself, its independence, its purity * * * may be destroyed * * *. No other body, but itself, can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of its own constituents. Accordingly, the power has always been lodged in the legislative body by the uniform practice of England and America." [7]

■ Since the very justification for this legislative authority is to resist encroachment, a necessary implication is that it is an absolute grant of constitutional power which may not be delegated to or shared with the courts. So the authorities univer-

---

4. Minn.St. 209.09 provides: "When an appeal is taken to the supreme court from the determination of the district court in any contest instituted under this chapter, the party appealing shall file in the district court a bond in such sum, not less than $500, and with such sureties, as shall be approved by the judge, conditioned for the payment of all costs incurred by the respondent in case appellant fails on his appeal. The notice of appeal shall be served and filed no later than ten days in case of a general election and no later than five days in case of a primary election after the entry of the determination of the district court in the contest. The return of such appeal shall be made, certified, and filed in the supreme court as soon as practicable and in any event within 15 days after service of notice of appeal. The appeal may be brought on for hearing in the court at any time when it is in session, upon such notice from either party, as the court may determine which notice may be served during term time or in vacation; and it may be heard and determined summarily by the court. The appeal from a determination of an election contest relating to the office of state senator or representative shall take precedence over all other business on the supreme court docket, and shall be disposed of with all convenient dispatch. A copy of the decision shall be forwarded to the chief clerk of the house of representatives or the secretary of the senate, as appropriate."

5. Kindregan, *The Cases of Adam Clayton Powell, Jr. and Julien Bond: The Right of Legislative Bodies to Exclude Members-Elects,* II Suffolk University L.Rev. 58, 63 (1968).

6. *The Legislature's Power to Judge the Qualifications of Its Members,* 19 Vanderbilt L.Rev. 1410 (1966).

7. Id., at 1412.

sally hold. Cases collected at Annotation, 107 A.L.R. 205.[8]

The statutes regulating election contests in Minnesota are predicated on this principle of legislative authority. Minn.St. 209.09 specifies what shall follow upon the rendering of a Supreme Court decision in a contest of a legislative election: "A copy of the decision shall be forwarded to the chief clerk of the house of representatives or the secretary of the senate, as appropriate." Minn.St. 209.10, subd. 2 then establishes procedures to be followed by the Legislature in making the ultimate determination.[9]

█ In short, we have no jurisdiction to issue a final and binding decision in this matter, and our opinion by statute will be and by the Minnesota Constitution must only be advisory to the House of Representatives.

II. The preeminence of legislative authority in this matter raises the issue of whether this court may render any opinion on the merits of this dispute without contravening well-established constitutional principles. Courts have traditionally considered themselves foreclosed from offering opinions that were not binding upon the parties. In the United States this tradition dates back at least to 1790, when the justices of the United States Supreme Court declined to respond to President Washington's request for their suggestions on the

organization of the judicial system.[10] Since then, a small minority of jurisdictions have provided for advisory opinions by express constitutional provision, and there are certain other deviations.[11] Minnesota has adhered to the majority tradition in a series of cases consistently declining invitations from various sources to issue less than ultimate decisions on a variety of issues. *In the Matter of the Application of the Senate,* 10 Minn. 78 (Gil. 56) (1865); *Rice v. Austin,* 19 Minn. 103 (Gil. 74) (1872); *State v. Dike,* 20 Minn. 363 (Gil. 314) (1874); *State ex rel. Young v. Brill,* 100 Minn. 499, 111 N.W. 294 (1907); *Seiz v. Citizens Pure Ice Co.,* 207 Minn. 277, 290 N.W. 802 (1940); *Minnesota Civil Liberties Union v. State,* 302 Minn. 216, 224 N.W.2d 344 (1974).

The initial case in this line, *In the Matter of the Application of the Senate, supra,* decided in 1865, actually declared unconstitutional on separation of powers principles a statute authorizing advisory opinions. To the extent that the statutes bringing the instant case before us do likewise, they may suffer from a similar infirmity. That these Minnesota decisions preclude out of hand our acting on this matter is not certain, however. For one thing, one of the major reasons courts have felt unable to issue advisory opinions is that often what is called for is speculative resolution of a hypothetical dispute which has not yet arisen in fact. Premature advice on the constitu-

8. A general discussion of the problem can be found in 19 Vanderbilt L.Rev., Id.

9. Minn.St. 209.10, subd. 2 provides: "In hearing the contest, the house or senate shall proceed as follows:
   "(a) At the time appointed, the parties shall be called, and, if they appear, their appearance shall be recorded;
   "(b) If the presiding officer be a party, a speaker pro tem shall be elected to preside;
   "(c) The contestant's evidence shall be submitted first, followed by that of the contestee, and the contestant shall open the argument, and close the same after the contestee has been heard;
   "(d) The vote upon the contest shall be viva voce, any member may offer reasons for the vote he intends to give, and a majority of the votes given shall decide; but no party to the

contest shall vote upon any question relative thereto; and
   "(e) The clerk or secretary shall enter the proceedings in the journal."

10. Hudson, *Advisory Opinions of National and International Courts,* 37 Harvard L.Rev. 970, 975 (1924).

11. Massachusetts, 1780; New Hampshire, 1784; Maine, 1820; Rhode Island, 1842; Missouri, 1865 (repealed 1875); Florida, 1868; Colorado, 1886; South Dakota, 1889; have constitutional provisions authorizing advisory opinions. A few state courts have given advisory opinions when authorized only by statute, and a few advisory opinions have been given without either constitutional or statutory support. *Douglas Oil Co. v. State,* 81 S.W.2d 1064, 1075 (Tex.Civ.App.1935).

tionality of legislative proposals falls into this category.[12]

Lack of a concrete controversy is not a problem in this case—here are two strongly adversary parties involved in a far from hypothetical dispute. Present in this case is only the other disfavored aspect of advisory opinions—the lack of finality of the judicial resolution. It is often difficult to separate these two underlying justifications for judicial refusals to render advisory opinions, and the judicial language on the subject, including that of the Minnesota cases cited above, is imprecise. Nevertheless, we are convinced that lack of finality alone is a significant, if not dispositive, factor.[13]

Secondly, whether we are free to act in this matter is also affected by the role played by this court in prior contests for legislative office. We have found no case in which this court has rendered an advisory opinion of the type requested here to the Legislature. This is not reflective of a lengthy tradition, however; the current legislative scheme outlined above was enacted in 1971. Prior to that time the Legislature, perhaps in recognition of its ultimate decision-making power and of the fact

that it was in this area treading close to the line of requesting advisory opinions, required of the courts only a conclusion on which candidate had received the greater number of legal votes, with other issues to be deferred until resolution by the Legislature.[14] Even this limited judicial action, however, was subject to subsequent legislative reversal. It was possible, of course, for the merits of an election contest to involve which candidate had in fact received the greater number of votes, as, for example, when the outcome depended on whether certain ballots were legal and countable. This court has acted in such cases in spite of the fact that its decision was advisory only. E. g., *Johnson v. Swenson,* 264 Minn. 449, 119 N.W.2d 723 (1963); *Fitzgerald v. Morlock,* 264 Minn. 520, 120 N.W.2d 339 (1963). Though the court in those cases did not address the advisory opinion issue, it may have considered it less objectionable to offer advice on the narrow legal question of what constitutes a valid ballot than, as required here, to cast judgment upon the actions and state of mind of the elected official himself.[15]

Countervailing these two uncertainties is the fact that the applicability of the usual

12. This is the point of view succinctly expressed by Felix Frankfurter in his "Note on Advisory Opinions," 37 Harvard L.Rev. 1002 (1924).

13. The Attorney General of the State of Minnesota, through his brief, has offered us a breakdown of the essential elements of a justiciable controversy, based on *Seiz v. Citizens Pure Ice Co., supra.* The point made is that in each of the cases cited above in which this court has declined to issue an advisory opinion, one of these elements was missing, whereas they are all present in the instant case. We agree that this may be a more difficult case than those cited. However, if constrained by the five *Seiz* elements, we would point to number 4—"the matter must admit of relief by decree or judgment"—as the one absent here. The instant case will not admit of relief by our opinion, but will merely proceed to the House of Representatives.

14. E. g., Minn.St.1961, § 209.10.

15. Counsel for contestants has cited to us additional cases in which this court has taken some

role in an election contest. However, we find these more readily distinguishable than those cited in the text. In *Moe v. Alsop,* 288 Minn. 323, 180 N.W.2d 255 (1970), this court appointed a referee to determine the narrow question of length of residency. However, the issue was whether the candidate's name should be placed on a primary ballot, not, as here, whether an *elected* official should be removed. In *Phillips v. Ericson,* 248 Minn. 452, 80 N.W.2d 513 (1957), this court reversed a trial court dismissal of an election contest. However, since trial had not yet been held, this court's decision caused the case to go back to the trial court, not, as here, to the Legislature for possible reversal. Finally, in *State ex rel. Goodwin v. Flahaven* and *State ex rel. Palmer v. Perpich,* 289 Minn. 149, 182 N.W.2d 182 (1971), this court decided that the lieutenant governor could not refuse to seat a senator possessing a certificate of election. The decision was binding upon the lieutenant governor only and did not address the merits of the senator's eligibility, the court specifically reserving that question for subsequent legislative determination without offering any opinion on it.

prohibition on advisory opinions to election contests has been faced squarely by other jurisdictions in decisions we find persuasive. In *Dinan v. Swig*, 223 Mass. 516, 112 N.E. 91 (1916), the court, after acknowledging the exclusive legislative authority to judge the eligibility of its own members, stated that therefore to require a judicial opinion in the case—

" \* \* \* would be imposing upon the judicial department of the government the investigation of a matter not resulting in a judgment, not finally fixing the rights of parties, and not ultimately determining a state of facts. It would subject a proceeding arising in a court to modification, suspension, annulment or affirmation by a part of the legislative department of government before it would possess any definitive force.

Manifestly, this is in contravention of art. 30 of the Declaration of Rights, which marks the entire separation of the legislative and judicial departments of the government." 223 Mass. 520, 112 N.E. 94.

See, also, *State ex rel. Smith v. District Court*, 50 Mont. 134, 145 P. 721 (1914).[16] Later decisions have reaffirmed the vitality of this earlier reasoning. *Combs v. Groener*, 256 Or. 336, 472 P.2d 281 (1970).

As with Article 30 of the Massachusetts Declaration of Rights cited in *Dinan*, Minnesota has an express constitutional provision mandating the separation of governmental powers:

"The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution." Article III, Section 1.

This structural principle is jeopardized by the case before us.[17] The judicial branch is unconditionally restrained from asserting a constitutional role in such a case and is reduced to carrying out such ministerial functions as the Legislature may request by statute. Such subordinate status in the fulfillment of a constitutional responsibility emphatically assigned to another branch of government is not in keeping with the rendition of *final* decisions which is our own separate and co-equal constitutional responsibility.

The foregoing reasoning does not apply to a trial court acting pursuant to Minn.St. 209.10, subd. 1. The trial judge selected by the parties to the election contest acts, in effect, as an agent of the legislative body involved. He hears and directs the recording of the evidence; he makes findings and conclusions with respect to the contest; he submits the record and his recommendations to the legislative body involved. Since he is acting, in practical effect, as a legislative agent for the purposes of the case, the legislative body is absolutely free to accept or reject his findings and conclusions. Re-

16. Counsel for appellants effectively argues that *Dinan* and *Smith* find a *trial* court precluded from offering an advisory opinion. The rule in Minnesota regarding trial courts is different for reasons explained in the text below. See, also, footnote 17, *infra*. What is persuasive about *Dinan* and *Smith* in regard to the proper role of *this* court is the reasoning, quoted in the text, that the separation of powers is jeopardized by the kind of advisory opinion requested here. This danger is greater in the case of advisory decisions from a supreme court than from a trial court.

17. It has been suggested to us that the caveat to Article III, Section 1—"except in the instances expressly provided in this constitution"—may be applicable because Article IV, Section 6 specifically states: "The legislature shall prescribe by law the manner for taking evidence in cases of contested seats in either house." The constitutions of Massachusetts and Montana do not contain the latter provision and it is suggested this distinguishes Minnesota cases from the decisions of those states. Though this may be true in the case of the trial court, we disagree as to this court. While the constitutional authority to prescribe the "taking of evidence" may legitimize the employment of a district judge for that purpose—essentially what has been done in this case—it speaks not at all to the task assigned this court, which has nothing to do with the taking of evidence.

spect for his training and experience as an objective fact-finder chosen by the parties and deference to his views on the credibility of the witnesses whom he has observed under direct and cross-examination can be anticipated, but it is not required. So long as it acts within constitutional limits, the authority of the House of Representatives to determine the qualifications of Mr. Pavlak to his seat is not subject to judicial control. We have in the past acceded to the process established by Minn.St. 209.10, and it seems to have served a useful purpose without disrupting the appropriate relationship between the Legislature and the courts. *State ex rel. Haines v. Searle,* 59 Minn. 489, 61 N.W. 553 (1894).

The Supreme Court of Minnesota, on the other hand, cannot and should not act as an agent for the Legislature. Its function is to act independently and with finality. In a case as this, we cannot act independently and with finality. To attempt to do so would be a clear violation of the constitutional directive that the House and Senate be the judges of the qualifications of their members.

■ In spite of the constitutional reservations expressed above, complete withdrawal from the dispute presented to us does not seem an option available to us at this time. We have heard the case and spent a great deal of time studying and deliberating on its merits before becoming acutely aware of the institutional considerations counselling dismissal. In the meantime the challenged legislator has been seated and voting, and his colleagues and ultimate judges anticipate that some assistance and guidance from us will be forthcoming. The unique necessities of the case move us to offer what we are able in the way of comment and analysis. This we do, reserving until the situation next presents itself a full decision on the propriety of any action in a case of this nature. Our remarks necessarily will be of limited scope and fall short of an opinion on the validity of Mr. Pavlak's election. We can advise on those matters in which now we have some degree of particular competence; i. e., those issues susceptible to objective determination. We are unable to offer conclusions as to those matters not susceptible to objective determination, in a matter in which our decision be final. The constitutional prohibition on advisory opinions precludes a decision of such dubious permanence.

III. There are basic factual conclusions to be drawn from the record of this case about which certainty is possible and about which a majority of the court is in agreement. They are:

A. In the years 1977–78 Arnold Kempe voted 1,469 of 1,798 roll call votes in the Minnesota House of Representatives.

B. On November 4, 1978, the *St. Paul Pioneer Press-Dispatch* carried an editorial in which it was stated, in effect, that Mr. Kempe had voted "four times in 1967–68— this out of more than 300 opportunities."

C. The reference to "1967–68" in the editorial was intended to be "1977-78" and was probably so understood by those who read it. (On Monday, November 6, this "correction" appeared in the *St. Paul Dispatch*: "Pavlak's research report stated Kempe voted four times during the years 1977–78, not, as incorrectly reported, 1967–68.")

D. Over 6,000 copies of the paper in which this editorial appeared were sold to persons who were eligible to vote in the election district involved.

E. On November 4–6, 1,800–1,900 copies of the November 4 editorial were distributed in the election district by Mr. Pavlak's campaign workers to prospective voters with this notation in the margin: *"Even with the papers 'typo' the message about our opponent is clear!"* The word "typo" referred to the figures "1967-68" used in the editorial when "1977–78" was intended.

F. By distributing the copies of the November 4 editorial Mr. Pavlak published a statement concerning Mr. Kempe which was false and material to the race for State

Representative in District 67A to be decided at the November 7th election.

G. Mr. Pavlak received 4,454 votes at the November 7th election; Mr. Kempe received 4,133. If a net of 161 voters were caused to switch their votes from Mr. Kempe to Mr. Pavlak because of the distribution of the false statement on November 4–6, Mr. Pavlak's action in publishing false statements produced his election.

■ In view of the above, it is our conclusion that Mr. Pavlak violated Minn.St. 210A.04 and that this violation was "deliberate, serious and material" within the meaning of Minn.St. 209.02. It was deliberate in the sense that the distribution of the statement as worded was intentional and was intended to affect the voting at the election. *Effertz v. Schimelpfenig*, 207 Minn. 324, 291 N.W. 286 (1940). It was serious because the distribution of 1,800–1,900 reprints in a single legislative district is a far from trivial amount. *Schmitt v. McLaughlin*, 275 N.W.2d 587 (Minn.1979). It was material because voting is the essence of a representative's position, and attacking voting performance is germane to one's conduct in that position.

IV. However, conclusions A–G above do not resolve this case. Ultimately, this contest reduces to a question of Mr. Pavlak's state of mind: did he act with "good faith"? This remaining and dispositive issue is not susceptible to scientific resolution and a consensus of the court thereon is not possible. As to it, we offer only the limited observations we are able to make with confidence.

■ Whether the standard is a constitutional one either mandated by or analogized from the *New York Times v. Sullivan* [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] line of cases, or a statutory one arising from Minn.St. 210A.38 and our decisions thereunder, especially *Schmitt v. McLaughlin*, supra,[18] we are of the opinion that this election should not be set aside if Mr. Pavlak acted in good faith. If his purpose was to deceive or mislead the electorate and receive undeserved support thereby, the office should not be his. Conversely, if he thought the general message conveyed by the reprint was a truthful one which he had tried to communicate all along, his election should not be disturbed. This was a test emphasized in the findings by the trial judge. Mr. Pavlak testified that his intent in distributing the editorial was merely to corroborate his claim that Mr. Kempe has missed a significant number of roll call votes. The district judge, chosen by the parties themselves, who had the opportunity of hearing and observing this testimony as well as that of the other witnesses, accepted this explanation.

■ There is an additional factor which the Legislature may wish to consider. Mr. Pavlak's false statement may or may not have influenced the election. We do not

---

18. *Schmitt v. McLaughlin* declined to deprive an elected candidate of his office where he acted in good faith, even though his violation of the election law was "deliberate, serious, and material." The court said:

"Violation of Minnesota election law does not necessarily mean that the candidate elected must be deprived of his office. Minn.St. 210A.38 provides that where the act 'complained of arose from accidental miscalculation or from some other reasonable cause of like nature, and in any case did not arise from any want of good faith, and under the circumstances it seems to the court to be unjust that the candidate shall forfeit his * * * office,' the penalty of removal need not be imposed. See *Bank v. Egan*, 240 Minn. 192, 200, 60 N.W.2d 257, 262 (1953). In this case, contestee believed that his use of the initials 'DFL' on his lawn signs and in his advertisements did not violate section 210A.02. It seems clear from the record that contestee intended only to indicate to the voters that he was a member of the DFL party. In fact, in response to a letter from contestant objecting to his use of the initials 'DFL', contestee suggested that contestant could also indicate his own political party affiliation. Contestant has indicated that he too would have identified himself with the DFL party. In light of these circumstances, where it appears that contestee's conduct did not arise from any lack of good faith, it would be unjust to require him to forfeit his office." 275 N.W.2d 591.

know and have no basis in the evidence for ascertaining the net effect of the circulation of the reprints by Mr. Pavlak or those who acted for him. We can assume, of course, that Mr. Pavlak thought that the distribution of the reprints would help his chances for election. Whether it did so in fact is nevertheless uncertain. The voters in District 67A were exposed to the same misinformation by reason of the circulation of the November 4 issue of the newspaper in which the editorial first appeared and the November 6 issue of the *Dispatch* which repeated the basic charge while correcting the errant date. Mr. Pavlak cannot be held responsible for this diffusion of false information. It can be fairly assumed that some prospective voters read the reprints who did not read the original editorial or the correction and that still others were more impressed with the misinformation by its repetition than would otherwise have been the case. But whether these facts account for a net shift of 161 votes—or any votes— from Mr. Kempe to Mr. Pavlak is something that we do not know and cannot ascertain from the record.

■ V. It is our hope that the constitutional responsibilities of the House of Representatives can more expeditiously be carried out in light of the considerations we have enumerated. We submit the opinion to that body with the understanding that whether the Supreme Court should henceforth decline jurisdiction in legislative election contests covered by Minn.St. 209.09 in light of Article IV, Section 6 and Article III, Section 1 of the Minnesota Constitution is a question reserved for future decision.

PETERSON, Justice (dissenting in part, concurring in part).

Contestant [1] and contestee, in accordance with the statutory system for election con-

tests, selected the judge who would consider the election contest: The Honorable Robert J. Breunig, Chief Judge of the Second Judicial District, an able jurist and experienced in election contest matters. Judge Breunig made several findings of fact, summed up in two basic conclusions: First, that contestee had not committed a deliberate, material, or serious violation of the Fair Campaign Practices Act (Minn.St. 210A.04) and, second, that "The claimed offense did not arise from want of good faith and under the circumstances, it would be unjust that Robert Pavlak should forfeit his office" (§ 210A.38).

This court's majority has substituted its findings for those of the trial judge relating to the first of these conclusions, from which I respectfully dissent. The second of these conclusions, that of contestee's good faith, has not been disturbed, with which I concur and about which I will accordingly make only abbreviated comment.

I. The limited role of the Supreme Court

A. A major part of this court's opinion, following a second oral argument, is devoted to an expression of our serious doubt that we either have or should assume jurisdiction to consider what constitutionally is a legislative issue and to issue what can only be an advisory opinion. The majority of the court nevertheless has decided to do so in this case and to express some findings contrary to those of the trial court. It is for that reason only that I have undertaken an independent study of the record made in the trial court and, by this separate opinion, submit in greater detail the evidence and principles supporting Judge Breunig's findings of fact.

1. "Contestant" in this opinion is, for simplicity, a reference to Arnold Kempe alone. It reflects, moreover, his real status as set out in the record. Before this election contest was brought, Mr. Kempe had discussions with the "House majority" (the representatives of his political party) and then assembled the individuals named as contestants in his office on November 18, 1978, together with him and Attorney Alan W. Weinblatt. They discussed the

"67 to 67 balance of power" in the House of Representatives and there decided that it was "better to have others than Kempe as contestant [because] if it was Mr. Kempe it may be taken, as some people call it, sour grapes." Mr. Kempe himself "had a general feeling because of the political nature of things that perhaps if it were to be brought, others could do it."

B. The majority, to the extent they have substituted findings of fact for those of the trial court, has departed from our usually limited scope of appellate review. It is well settled, as stated in *In re Estate of Balafas*, 293 Minn. 94, 198 N.W.2d 260 (1972), and our Rule 52.01, Rules of Civil Procedure, that findings of fact made by the district court should not be set aside unless "clearly erroneous." I respectfully submit, moreover, that where an able and experienced trial judge has had the opportunity to observe and hear the several witnesses in this case and to assess their credibility (including impeachment of one of the two parties in this election contest), neither we nor, for that matter, legislators have any unique competence to second guess him on the basis of a cold record.

The state Solicitor General, appearing in the second oral argument at the direction of the Attorney General, pursuant to our invitation, affirmed that in this case our limited role is to determine whether the findings of fact made by the trial court are supported by the evidence, not to make findings ourselves.

## II. A constitutional imperative

A constitutional perspective is vital to consideration of *all* of the issues in this election contest, for the interpretation and application of § 210A.04, upon which this contest is based, inescapably implicates the free expression guarantees of the First Amendment to the United States Constitution as well as the like provisions of art. 1, § 2, of the Minnesota Constitution. The United States Supreme Court in *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488 (1966), a matter arising under the Alabama Corrupt Practices Act, made it clear:

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course in-cludes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, see *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, to play an important role in the discussion of public affairs."

Minn.St. 210A.04, subd. 1, a section of the Minnesota Fair Campaign Practices Act, provides:

"Every person who writes, prints, posts, or distributes, or causes to be written, printed, posted, or distributed, except by broadcasting, any circular, poster, or other written or printed matter containing false information with respect to the personal or political character of acts of any candidate, which is designed or tends to elect, injure or defeat any candidate for nomination or election to a public office, shall be guilty of a gross misdemeanor."

We held in *Dart v. Erickson*, 188 Minn. 313, 319, 248 N.W. 706, 709 (1933), that there is a "necessity for strict construction" because the Corrupt Practices Act is "highly penal, not only in imposing the penalties of misdemeanor upon offenses against it, but also in adding, for candidates, that of forfeiture of nomination or office." We even more recently in *Matter of Contest of General Election [Graves v. Meland]*, 264 N.W.2d 401, 403 (Minn.1978), involving the present statute, said:

" * * * These are criminal statutes, violations of which are *gross* misdemeanors. Therefore, the rule of strict construction of penal statutes must be applied notwithstanding the civil nature of the proceeding before us. Even in this civil proceeding, the consequences of a violation are severe since the decision of the voters is judicially set aside, and under the statute they have no opportunity

to vote for a disqualified candidate in an election to fill the vacancy." (Italics supplied.)

The constitutional law of libel has been established by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), and its progeny, involving false statements concerning public officials. The constitutional rule is that such statements are actionable only upon a showing of "actual malice," which is now constitutionally defined as made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 280, 84 S.Ct. 726, 11 L.Ed.2d 718, 95 A.L.R.2d 1435. The short-hand reference to this *New York Times* test is now "knowing or reckless falsity." *Gertz v. Welch*, 418 U.S. 323, 347, note 10, 361, 94 S.Ct. 2997, 3010, 3018, 41 L.Ed.2d 789, 809, 818 (1974). This decision was made "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." And, further, "[t]hat erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive,' * * *." 376 U.S. 270, 84 S.Ct. 721, 11 L.Ed.2d 701, 95 A.L.R.2d 1430.

Mr. Justice Brennan, who wrote for the United States Supreme Court in *New York Times Co. v. Sullivan, supra*, reiterated its premise in *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597, 605 (1966):

"* * * The motivating force for the decision in *New York Times* was twofold. * * * There is, first, a strong interest in debate on public issues, and second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized."

The United States Supreme Court, as it recalled 10 years later in *Gertz v. Welch, supra*, "concluded that a 'rule compelling the critic of official conduct to guarantee the truth of all his factual assertions' would deter protected speech." 418 U.S. 334, 94 S.Ct. 3004, 41 L.Ed.2d 802. "* * * The First Amendment requires that we protect some falsehood in order to protect speech that matters." 418 U.S. 341, 94 S.Ct. 3007, 41 L.Ed.2d 806.

Important elements in the constitutional rule of *New York Times*—essential to consideration of the evidence and findings in the instant case—have been made absolutely clear by the United States Supreme Court, as well as this court, in applying the rule:

1. The knowing or reckless falsity of a statement must be proved with "convincing clarity."[2] Mere proof of negligence does not meet the test. *New York Times Co. v. Sullivan, supra; Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Rosenblatt v. Baer, supra; St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Rose v. Koch*, 278 Minn. 235, 154 N.W.2d 409 (1967). Mr. Justice MacLaughlin, in *Hirman v. Rogers*, 257 N.W.2d 563, 566 (Minn.1977), said: "We have defined actual malice as more than mere negligence and probably even more than highly unreasonable conduct. *Rose v. Koch, supra*."

---

2. We ourselves gave definition to that term in *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn.1978): "* * * 'Clear and convincing proof' means exactly what is suggested by the ordinary meanings of the terms making up the phrase. Satisfaction of this standard requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt. Clear and convincing proof will be shown where the truth of the facts asserted is 'highly probable.' "

2. The public official has, and should exercise, other opportunities for refuting misstatements of fact. Mr. Justice Harlan, in the plurality opinion in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967), noted that public officials have "sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements. *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (Brandeis, J., dissenting)." And this was similarly expressed in the concurring opinion of Mr. Chief Justice Warren. More recently, in *Gertz v. Welch, supra* (418 U.S. 344, 94 S.Ct. 3009, 41 L.Ed.2d 807), Mr. Justice Powell expressed in his plurality opinion:

" * * * The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channel of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."

3. The constitutional imperatives of *New York Times* are not confined to actions for defamation and are a restraint on executive or legislative action as much as judicial action. As the United States Supreme Court re-emphasized in *Garrison v. Louisiana, supra* (379 U.S. 74, 85 S.Ct. 216, 13 L.Ed.2d 133):

" * * * Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. * * * For speech concerning public affairs is more than self-expression; it is the essence of self-government."

The relevance of these cases is not limited to actions for libel,[3] for the rationale is applicable to all discussion and debate about public affairs. The United States Supreme Court was directly concerned with the sanctions that might be employed for such speech. In New York Times the sanction was the possibility of ruinous money judgments against the press which, because they would intimidate the press and stifle wide-open discussion of public affairs, would chill the First Amendment. The sanction in this election case is no less serious. One statutory sanction is that "A candidate elected to an office, and whose election thereto has been annulled and not set aside * * * shall not, during the period fixed by law as the term of said office, be appointed or elected to fill any vacancy which may occur in such office" (§ 210A.39)—in short, a total forfeiture of any right to hold the office or to be a candidate in a new election to fill the vacancy created. A second statutory sanction is the possibility of prosecution for commission of a gross misdemeanor (§ 210A.04). The chilling effect upon the First Amendment is clearly no less than that feared in New York Times and its progeny.

Two election-related cases illustrate and instruct us in the application of these New York Times' principles to the instant case. The first is *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262. St. Amant, a candidate for public office, made a televised speech,[4] in which he read questions put to a union member, Albin, and Albin's answers which falsely charged

---

**3.** These cases are, of course, directly relevant to the claim of contestant, at oral argument, that the editorial reprint upon which this action is based was seriously false *and* defamatory. Minn.St. 210A.04, subd. 1, as we held in *Graves v. Meland*, 264 N.W.2d 401, 404 (Minn.1978), "clearly relates to *defamatory* publications."

**4.** Minn.St. 210A.04, inexplicably excludes broadcast statements from its prohibitions and sanctions, the more remarkable since the broadcast media is now more widely used than the print media in major political campaigns. Contestee in this case contends the statute, because of that exclusion, constitutes a denial of equal protection as guaranteed by U.S. Const. Amend. XIV and Minn.Const. art. 1, § 2. The court in this case has chosen not to address this issue.

Thompson, a public official, with criminal conduct. The Louisiana Supreme Court had affirmed a trial court judgment for libel, based on a finding that St. Amant had acted in reckless disregard of whether or not those answers were true or false, since he had no personal knowledge of Thompson's activities, had relied solely on an affidavit of Albin without evidence of Albin's veracity, had failed to verify the information with others who might know the facts, and had mistakenly believed that he had no responsibility for the broadcast because he was merely quoting Albin.[5] The United States Supreme Court reversed, stating, in part (390 U.S. 730, 88 S.Ct. 1325, 20 L.Ed.2d 267):

"These considerations fall short of proving St. Amant's reckless disregard for the accuracy of his statements about Thompson. * * * [Our] cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

" * * * Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not.

*　　*　　*　　*　　*　　*

5. We will later, for the instant case, be considering contestee's reliance on the editorial statements of the reputable St. Paul Dispatch-Pioneer Press, without reverification, and upon apparent belief that the responsibility for any misstatement was the newspaper's, not his.

6. We will later, for the instant case, be considering a republished newspaper misstatement, within 3 days before the election, that

"By no proper test of reckless disregard was St. Amant's broadcast a reckless publication about a public officer."

The second case is *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). *Three days before the election*, in the New Hampshire Democratic primary election of candidates for the United States Senate, the Concord Monitor, a daily newspaper, published a column, "D. C. Merry-Go-Round," syndicated by the North American Newspaper Alliance (NANA), discussing the forthcoming election, in which it characterized Roy, one of the candidates, as a "former small-time bootlegger."[6] The New Hampshire Supreme Court affirmed a judgment in libel against both NANA and the Monitor Patriot Company. The United States Supreme Court reversed because the issue had not been submitted to the jury with instructions sufficiently squared with the New York Times' standard, stating, in part (401 U.S. 274, 91 S.Ct. 626, 28 L.Ed.2d 42):

"The considerations that led us thus to reformulate the 'official conduct' rule of *New York Times* in terms of 'anything which might touch on an official's fitness for office' apply with special force to the case of the candidate. * * *

*　　*　　*　　*　　*　　*

"The application of the traditional concepts of tort law to the conduct of a political campaign is bound to raise dangers for freedom of speech and of the press. The reasonable-man standard of liability, for example, served admirably the essential function of imposing an objective and socially acceptable limit on the freedom of an individual to act with relation to others. But under our system

contestant voted only 4 times out of 300 opportunities, patently far less reprehensible than an accusation of criminal conduct. See, also, *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), in which District Attorney Garrison, at a press conference, falsely charged certain state court judges with hampering his efforts to enforce the state's vice laws.

of government, we have chosen to afford protection even to 'opinions that we loathe and believe to be fraught with death,' *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (Holmes, J., dissenting). A community that imposed legal liability on all statements in a political campaign deemed 'unreasonable' by a jury would have abandoned the First Amendment as we know it." [7]

### III. Contestant's claim that contestee violated the Fair Campaign Practices Act

The contestant contends that contestee violated the election law solely because he distributed a *reprint* of an editorial in the Saturday, November 4, 1978, morning edition of the St. Paul Dispatch-Pioneer Press (Exhibit 1) containing this single challenged sentence: "We have seen nothing to dispute [Pavlak's] research report on Kempe that shows [Kempe] voted four times in 1967-68

—this out of more than 300 opportunities." The trial court found that the sentence was ambiguous and in effect found that, in any event, it was neither deliberate nor material nor serious. The majority, by its substituted finding, concludes that the editorial sentence was false and that reprinting it was serious and material, as well as deliberate. I respectfully submit to the members of the House of Representatives my observations, based upon the record as evaluated objectively and realistically by the trial judge, as they now must make a final decision of this election contest.

It is important to note, at the outset, that this election contest hinges upon a single sentence in a single editorial—an isolated incident—that should not be divorced from the whole of that editorial and from the total context of the election campaign. A substantial part of the editorial, consisting of the opening, middle, and concluding paragraphs, representative of the nature of the whole, is set out in the margin.[8] The

---

7. Our own case of *Rose v. Koch*, 278 Minn. 235, 154 N.W.2d 409 (1967), is of more tangential interest, but indirectly involved an election campaign. Koch and Christian Research, Inc., in a publication entitled "Facts for Action," stated that Rose (a candidate for election and, subsequently, a representative in the Minnesota Legislature) "collaborates with Communists and Communist Fronters." (Rose's opponent, a member of the same political party, republished the defamatory materials, but no action for libel was initiated against him.) We there carefully canvassed the United States Supreme Court cases up to that time and, as in Monitor Patriot, reversed upon the ground that the instructions to the jury, upon which it returned a libel verdict for Rose, did not comport with the New York Times constitutional principles.

8. "In elections past, the *Dispatch* and *Pioneer Press* have presented a sort of laundry list of legislative endorsement, bi-partisan in selection, but with a list toward the DFL. This last has been the result simply of one party's fielding better candidates than the other. If a party has deserved minority status, in fact, it has been the Minnesota Republican party.

"With party designation have come significant gains for the DFL. The party also got a tremendous boost in the reaction to the Watergate scandal. With these gains have come total control and now an arrogance that is both unbecoming [and] unhealthy.

*    *    *    *    *    *

"We make the following endorsement, then, based on our opinion of the quality of the candidates and, importantly, on the need to help impress our lords on Capitol Hill that they are not immortal, that there are citizens out there wanting a voice, many of them 'madder than hell.'

"Let us start in District 63B, Highland Park, where incumbent DFLer Richard Cohen is being challenged by John Drew, the IR candidate. Our endorsement goes to Drew for reasons too many to enumerate. Drew, a computer operations specialist employed by Mutual Service Insurance Company, has sized up the ailments of the day with accuracy—profligate spending, crippling taxation in all brackets, the vested interest government has in inflation (he is for tax indexing), the decline of our schools, the state's unhealthy climate for business—and has demonstrated an understanding of these and other problems that is to be applauded.

*    *    *    *    *    *

"There is an interesting race in District 67A, one of a few that crosses county lines (Ramsey and Dakota). Former Rep. Robert Pavlak, IR, a St. Paul police lieutenant, is attempting a comeback against a state representative difficult to classify either as a liberal or a conservative. This would be Arnold Kempe, West St. Paul attorney.

"Pavlak, through his years in the Legislature, earned a reputation as an independent, outspo-

editorial is self-descriptive: A series of endorsements for legislative candidates in districts within Ramsey-Dakota-Washington Counties, that newspaper's strongest circulation area, generally favorable to Independent Republican (IR) candidates (contestee among them) and unfavorable to Democratic-Farmer-Labor (DFL) candidates (contestant among them). The issue in those more complete contexts, then, is whether the isolated sentence in that editorial, republished by contestee, was "false" and, if so, whether it was "serious" and "material." [9]

A. Any consideration of the factual issue of whether the challenged sentence of the editorial was "false" should start with the meaning of the word, for it has the various and distinctive nuances ascribed to it in Webster's Third New International Dictionary (1966) p. 819. Its primary meaning is: "Not corresponding to truth or reality; not true" (the synonyms of which are "erroneous, incorrect"). A secondary, pejorative meaning is "intentionally untrue" (the synonym of which is "lying").

This sentence, if considered false, is "false" only in the primary meaning of the word. It is false when it attributes to contestee's research report the statement that incumbent voted only 4 times out of

more than 300 opportunities, for contestant concedes that nothing in contestee's notes delivered to the editor warranted that statement. There was no mention of "four votes" in those notes; the votes were a compilation of contestant's nonvotes. If the sentence, as a whole, is read to say that contestant voted only four times in the entire legislative session, it would be apparent to any intelligent reader as palpably unbelievable and preposterous. Robert Larson, who prepared contestee's regular campaign materials and who did not think the reprint would add anything beneficial to the campaign, characterized the editor's prose in these words: "We are talking about a man who writes tortuous syntax that is unbelievable." Whatever the fault of the editorial writer, no one even intimates that *he* intended to publish an untruth.[10]

The majority of this court, unlike the trial judge, reads the sentence as totally false, ignoring one unassailable truth in it: Contestant had "more than 300 opportunities" to vote—and voted no times, not even four times. The majority, although stating at a later point that "voting is the essence of a representative's position" at this point states that contestant missed "only" 329 votes,[11] a charitable adverb presumably not shared by those of contestant's constituents who voted for his opponent.

---

ken and hardworking 'show me' type of individual. We have seen nothing to dispute his research report on Kempe that shows the incumbent voted four times in 1967–68—this out of more than 300 opportunities.

"This is, indeed, unusual. Kempe, like Pavlak, is for tax indexing, but one wonders if he would be around to vote for it.

"There is a rather modest list for a rebellion, but it is the best we could muster. We do think the majority party needs a touch of anxiety, if not an outright fright."

9. I do not address the third statutory element of whether the republication of the editorial was "deliberate." It was so, in the sense that it was contestee's voluntary act to reprint and distribute it. It was not so, however, in the sense that contestee had no conscious intention to commit an unfair campaign practice—an aspect more properly considered together with a separate finding of whether or not contestee acted in good faith.

10. Contestant's Exhibit 9, a newspaper report in the Minneapolis Tribune, November 15,

1979, confirms this: "William Sumner, editor of the St. Paul Dispatch and Pioneer Press, admitted to misreading material given him by Pavlak. He published a correction Monday, 'I played the complete rookie,' Sumner said. 'I misinterpreted it.'"

11. Contestant concedes that he failed to vote on 329 roll-call votes in the 1977–1978 session. He explains in his own published responses that he had a conflict between committee sessions and House sessions at which roll-call votes were taken. The record does not indicate whether there was a "call-of-the-House" at those times, but it does disclose that others similarly situated on committee business did vote. The days on which the roll-call votes were missed were not few: March 30; April 1, 11, 13, 20, 21, 25; May 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 17, 18, 19, 20, 21, 23, 1977; and February 6, 20, 21, 22, 23; March 3, 6, 10, 13, 14, 17, 20, 22, and 23, 1978.

Judge Breunig thought the challenged sentence was facially ambiguous, based upon his own reading and the varying readings given it by witnesses who appeared before him. This ambiguity is made more apparent by a reading of the editorial reprint together with contestee's other campaign brochures and advertising reprints in the packets with which the 1,800 to 1,900 editorial reprints were distributed, none of which even intimated that contestant voted only four times in the 1977–78 session. It is undisputed that no more than about 400 of the editorial reprints were distributed alone and not as part of a complete packet of contestee's campaign materials.

B. Discussing next the issue of whether the editorial reprint (Exhibit 1) was "material" or "serious," it will now be assumed, solely to make these distinctly different points clearer, that the challenged sentence was both unambiguous and false. The two statutory terms are, in my view, opposite sides of the same coin,[12] both sides of which must yield an answer to the ultimate question of whether the circulation of the editorial reprint, viewed in the full context of the campaign and not as an isolated incident, probably resulted in the election of contestee and not contestant. Judge Breunig found that it did not. The majority of this court states only that the answer is "uncertain." The members of the House of Representatives will, upon their own assessment of the record, decide whether Judge Breunig's judicial answer is to be accepted or rejected.

1. The materiality and seriousness of the editorial reprint may be measured, first, in relation to the content and circulation of all the other campaign materials—charge and counter-charge—of the two candidates. Well before the publication and republication of the challenged November 4 editorial, the voters of District 67A had been massively exposed to the fact that contestant had not voted on more than 300 roll-call votes. It was obviously an extensive and expensive campaign, replete with numerous lawn signs, paid newspaper advertising, advertising reprints, and elaborate campaign brochures. Robert Larson, who was in charge of publications for contestee, testified that contestee's campaign was, from its inception, "geared to the legislative truancy" of contestant and the promotion of contestee's own "positive program."

Larson prepared two major campaign pieces for that purpose. The first was a multicolor fold-out brochure (Exhibit 6), containing such conventional elements as photographs, personal biography, endorsements, and positions on voter-interest issues, to be used as a handout on a door-to-door campaign and as an "add-on" for later "literature drops." This major brochure prominently displayed, below contestee's photograph, a "Dear Neighbor" letter signed by contestee and directed exclusively at the record of contestant's missed votes.[13] This brochure was distributed over the entire legislative district by literature drop in early October. The second campaign piece was an advertisement, with the same theme, to be inserted in the South Edition of the St. Paul Dispatch, the West St. Paul-Mendota Heights Sun, the West Side/West St. Paul Voice, and the Dakota County

12. I disagree with the apparent view of the majority that whether the false statement was "serious" is to be determined simply by whether a circulation of 1,800 to 1,900 of the editorial reprints was a "trivial amount."

13. This is the text of contestee's "Dear Neighbor" letter (Exhibit 6): "It would be quite easy for me to rest on my eight years of solid accomplishment as a former state legislator.

"But . . . so many of our neighbors have urged that I do something about the deplorable lack of representation this District has been experiencing. Our country was founded on the idea of 'no taxation without representation.' Well, Neighbor, that's still our problem today!

"We have a 'some-time' representative who misses sessions and failed to record a vote at least 305 times during 1977–78 Sessions alone. [Recorded in House Journal, 1977–78]

"You see the need. So do I. Together we can make a change. It's an idea whose time has come."

Tribune (Exhibit 7) toward the end of the campaign. Reprints of this advertisement were distributed by literature drop late in October as part of a packet of several of contestee's campaign pieces.[14]

James Aydt, contestee's campaign manager, conferred with Robert Larson on November 4 about reprinting a marked copy of that morning's St. Paul Dispatch-Pioneer Press editorial. Larson reluctantly acceded to Aydt's wish, however, for this significant reason (credited by the trial judge): "To my way of thinking this editorial added nothing to what we had stated. * * * We already had two pieces of literature that emphasized the poor voting record; anything more would be redundant."

Contestant's campaign was no less vigorous. He had an attractive major brochure (Exhibit 22) similarly complete with photographs, biographical information, impressive endorsements, and a statement of his legislative accomplishments and goals. One

paragraph of this brochure stressed his laudable attendance record.[15] This brochure was distributed throughout the district both by literature drop and by mailing to each registered voter in the district. Contestant had, in addition, his own "Dear Neighbor" letter (Exhibit 21), widely distributed in obvious rebuttal of contestee's "Dear Neighbor" letter.[16]

Rounding out the campaign for both candidates was a story in the October 25 West St. Paul-Mendota Heights Sun headlined "Pavlak attacks Kempe attendance-voting record" (Exhibit 27), and a story in the West Side/West St. Paul Voice, mailed or delivered to all residences and businesses in District 67A on November 6, containing a front-page photograph of contestant and a story headlined "Irate Kempe counters ads of Bob Pavlak." Inside this West Side/West St. Paul Voice was contestant's "Open Letter to Voters," in the same text as Exhibit 23,[17] a second advertisement stressing his accomplishments in the past

14. All except about 400 of the 1,800 to 1,900 editorial reprints (Exhibit 1) circulated by contestee were included in these packets. One other item distributed at the same time as Exhibit 1 was Exhibit 8, a reprint of an advertisement published in the November 5 St. Paul Pioneer Press by SEIU Local 284, listing contestant among legislators who had voted in a closed-to-public meeting to permit legislators to retire with a vested pension after 6 years' service.

15. This is the relevant paragraph of contestant's major brochure (Exhibit 22): "Rep. ARNOLD KEMPE believes that your vote in the Legislature is important. His attendance during the Legislative sessions is as follows:

"1975 – 1976 Sessions    100%
"1977 – 1978 Sessions    96%
"(1975–78 House Journals)"

16. This is the text of contestant's "Dear Neighbor" letter (Exhibit 21): "My opponent again is misrepresenting facts as he did in 1974 when he was voted out of office. In 1974 Pavlak mailed out a letter to renters with an enclosed list of five then recently enacted pieces of legislation benefiting renters. He implied that he had supported and worked hard for that legislation. But in fact Pavlak had voted against the renter's tax credit and most of the legislation on his list. Now again he is misrepresent-

ing the record on my attendance record during the sessions. My attendance record for my two terms is;

"1975 – 1976 Sessions    100%
"1977 – 1978 Sessions    96%
"(1975–78 House Journals)"

17. This is the full text of contestant's "Open Letter to Voters" (Exhibit 23): "My Republican opponent's ad that I missed sessions and votes is a deception on the voters. The fact is in the 1975–76 Sessions my attendance was 100%, and in the 1977–78 Sessions my attendance was 96%.

"On the matter of voting, my Republican opponent knows that I served on House-Senate Conference Committees that were in meetings while the House was in session. On my H.F. 544, removing the moratorium on I-35E, I was in Conference Committee in both the 1977 and 1978 Sessions.

"On my Determinate Sentencing under Guidelines Bill, I was in Conference Committee Meeting for five days during the 1978 Session. On H.F. 82 I was in Conference Committee two days in 1978 and successfully stopped the Senate attempt to reduce penalties on crimes of receiving stolen property and theft. For my Republican opponent to try to use my inability to vote during Conference Committee Meeting is a clear fraud and deception on the voters.

"To be selected by the House to represent the entire body in working out the differences be-

legislative session and his proposals for the next session, a third advertisement of endorsement written in Spanish, and a fourth advertisement covering the entire back page and containing much the same material as his main brochure (Exhibit 22). In the same issue, contestee published an advertisement again attacking contestant's nonvoting record in much the same text as Exhibit 7,[18] a second advertisement opposing government spending and high taxes, and a third advertisement containing an endorsement written in Spanish.

Judge Breunig took specific note of this evidence in this realistic finding:

"Considered in light of Arnold Kempe's distribution of campaign material (Exhibits Nos. 22 and 23) which addressed the voting record issue and in light of the already wide dissemination of the editorial by the St. Paul Pioneer Press-Dispatch, contestee's distribution of that editorial had no material effect on the outcome of the election."

2. The materiality and seriousness of the editorial reprint should be measured, second, in relation to the far greater readership of the original editorial itself and, in addition, the subsequent "correction" editorial on November 6. The November 6 editorial was actually more damaging than that of November 4, for it made no mention of "300 opportunities" and simply declared that "Kempe voted four times during the years 1977–78." It is conceded by contestant that, whatever may be contestee's responsibility for the reprint, contestee was not in any way responsible for the *two* editorials published in the newspaper itself. The measurement relates exclusively to the isolated sentence about contestant's voting record, of course, and does not measure the total effect of everything else in the original editorial—including the favorable endorsement of contestee.

The circulation of the St. Paul Dispatch-Pioneer Press in District 67A on November 4, according to the stipulated records of the newspaper, was: 5,709 home deliveries, plus 622 sales to nonsubscribers—a total of at least 6,300 individuals. Aggregate circulation of the St. Paul Dispatch on November 6 was 5,061. Circulation by contestee of the editorial reprint, Exhibit 1, on the other hand, was limited to 1,800 to 1,900 individuals.

Circulation numbers, of course, do not necessarily reflect actual readership. It seems a reasonable assumption, however, that voters who voluntarily purchase a newspaper for the purpose of reading it are far more likely to have read the original editorial than those who are the involuntary recipients of a newspaper reprint included in a packet of campaign materials placed on their automobiles at church or on the doorsteps of their homes. This is more than an assumption, moreover, for it is demonstrated in fact by two witnesses for contestant. Frank Rodriguez, one of the titular contest-

---

tween the House and Senate versions of legislation is both an honor and a high obligation. For my Republican opponent to use this to claim I didn't vote when I could not is an attempt at deception."

**18.** This is the slightly abbreviated text of contestee's advertisement (Exhibit 7): "Where was Arnie when we needed him to vote on these 1977 & 78 proposed laws? Kempe missed 300 votes!

"Was he too busy working as Attorney for the City of West St. Paul to take care of District 67–A's STATE business?

"Or was he too busy working at his PRIVATE law practice to take care of either STATE or CITY business?

"Or WHAT?

"Actually, Arnie's reason for missing all the votes he did is really *immaterial* ! He missed them. When your State Representative fails to vote on proposed legislation your interests are ignored, your voice is silenced, you are without representation. You, as a District 67–A voter deserve better than this.

"When you return Bob Pavlak to the legislature you will again have representation. During his previous eight years as a State Representative, Pavlak had an almost perfect attendance record and rarely missed a legislative vote.

"As your representative PAVLAK PLEDGES to work diligently to reduce government spending significantly while maintaining needed expenditures * * *"

ants, testified: "[The editorial reprint] was put on my car and I did not read it." Henry Duchene, another witness for contestant, testified that he saw the reprint on the Monday evening before the election but "didn't pay any attention to it."

3. The circulation of the editorial reprints at four churches in District 67A on Saturday-Sunday, November 5–6, warrants brief mention supplemental to the two points just made. The 550 to 650 reprints placed on the windshields of automobiles in the church parking lot are included in the total of 1,800 to 1,900 reprints circulated. It was approximately 400 of these that were distributed without being included in a packet containing several of contestee's campaign materials. Whether all of these remained on the windshields is uncertain, for there is testimony that numbers of the reprints were blowing about on at least one of the parking lots. Contestant similarly circulated his own campaign materials in the same manner, on this same weekend, at the same churches.

4. The contemporaneous[19] reaction of contestant at the time of the publication of the original editorial—and even at the time of distribution of the editorial reprint—is the ultimate confirmation that distribution of the reprint was not serious or material. David Nitti, contestant's campaign manager, met contestant on the street at noon that Saturday, November 4, and told contestant that the *endorsement* was damaging; it was only as an apparent afterthought that he added "they screwed up your voting record." James Scheibel, a titular contestant, similarly "took it as an endorsement" and thought "the intent of the whole editorial was that"—and he so mentioned it to contestant either that day or it "could have been" the next day, No-

vember 5. Thomas Quinlan was called by contestant at 9 a. m. the same day the editorial appeared and "they talked about it." Nothing more than that. These reactions by contestant's active supporters confirm that of James Aydt, contestee's campaign manager, that the importance to contestee was simply the fact that it was an endorsement—an endorsement by the major daily newspaper in the tri-county metropolitan area in which District 67A is located.

The reaction of contestant himself on that weekend is even more demonstrative. Contestant, aware of the editorial, ordered 3,500 "insti-prints" of his "Open Letter to Voters" on the issue of his voting record (Exhibit 23) and made his own weekend distribution, including the same churches at which the editorial reprint (Exhibit 1) had been distributed by contestee. Recognizing the editorial as a damaging endorsement, the reverse side of the "Open Letter" contained a reprint of a news item characterizing contestant as a "Pro-Life Representative." Not then perceiving the now-challenged sentence of the editorial as anything more than a repetition of contestee's continuing assault upon his record of nonvotes, contestant responded simply with a last-minute distribution of a reprint repeating his regular rebuttal.

Contestant attempted to evade the obvious inferences from his contemporary conduct by asserting before Judge Breunig that he had not seen the editorial until Monday, November 6. Contestant's testimony was patently impeached by the contrary testimony of Nitti, Scheibel, and Quinlan. Thomas Quinlan additionally testified concerning his conversation with contestant on the morning of November 4: "We both agreed we had seen it." The trial

---

19. "Contemporaneous," of course, refers to the weekend of November 4–6. The noncontemporaneous period would include the period from those dates to the belated meeting in contestants' office on November 18, previously discussed, when a decision was made to contest the election in light of the 67 to 67 deadlock in

partisan representation in the House of Representatives. The Independent-Republicans unsuccessfully undertook to break the legislative deadlock by an election contest on similar grounds, *O'Loughlin v. Otis*, 276 N.W.2d 38 (Minn.1979), which was aborted on procedural grounds.

judge may well have viewed with similar incredulity contestant's explanation that he did not regularly read the editorial page, preferring to read the sports pages. A permissible inference arises that contestant's delayed efforts to mitigate the claimed damage resulting from the November 4 editorial, by demanding from the publisher late on November 6 a retraction that could not have been published prior to the November 7 election day, even assuming that the court fully credited the uncorroborated account of his conversation with the publisher, may have been tactical: To win election at the polls on the basis of his full opportunity during the whole of the campaign to refute any and all misstatement about his voting record—but, if unsuccessful, ultimately to defeat his opponent through an election contest.

IV. Contestee's good faith

The statutory defense of good faith is alone determinative of this election contest. This court, which applied the defense in one of our most recent election cases, *Schmitt v. McLaughlin*, 275 N.W.2d 587 (Minn.1979), does not make a finding contrary to Judge Breunig's finding that contestee did not act in bad faith. It is, indeed, noteworthy that in Schmitt we ourselves unanimously invoked the statutory defense of good faith even though it had not been mentioned by the trial court as a basis for dismissing the election contest. We concluded that the expressed will of the voters is not lightly to be overturned.

"Violation of Minnesota election law," as this court unanimously held in *Schmitt v. McLaughlin*, "does not necessarily mean that the candidate elected must be deprived of his office. Minn.St. 210A.38 provides that where the act 'complained of arose from accidental miscalculation or from some other reasonable cause of like nature, and in any case did not arise from any want of good faith, and under the circumstances it seems to the court to be unjust that the candidate shall forfeit his . . . office,' the penalty of removal need not be imposed. See, *Bank v. Egan*, 240 Minn. 192, 200, 60 N.W.2d 257, 262 (1953)." (275 N.W.2d 591.)

The defense of good faith is not only statutory but, as discussed in the introduction of this opinion, has a constitutional dimension protecting the freedom of spoken and written words in the discussion of public affairs, except only if it is proved with convincing clarity that such words were used with knowledge of their falseness or in reckless disregard of whether true or false. Contestee's publication of the reprint without a more complete cautionary comment in the margin may well have been negligent, notwithstanding his stated assumption that the newspaper, with its considerable investigative resources, had discovered information of which he was not aware.[20] An adverse judgment based on negligence, however, is constitutionally impermissible.

State legislators, who will now make the final judgment in this election contest, certainly appreciate the almost inevitable inadvertence in making ambiguous or erroneous statements in political campaigns, particularly when absorbed in the sometimes frenetic hours and short days immediately preceding election day. The isolated error, of course, is to be distinguished from a continuous course of deliberate misrepresenta-

---

20. This reliance was not unreasonable, for as disclosed in contestant's Exhibit 18, the editorial research staff of the St. Paul Dispatch-Pioneer Press, several days later, did make its own independent research of the House Journals for the 1977–78 sessions, from which it found: "Out of a total of 1,687 opportunities to vote on various bills, Kempe voted 1,352 times." The possibility of good faith human error in such research is underscored by the fact that such subsequent research showed that while contestant had noted 1,798 roll-call opportunities," the editorial research showed 1,687 such opportunities. But, even so, the editorial research showed a failure to vote 335 times, whereas the parties themselves agree that contestant had failed to vote 329 times.

tion.[21] The circumstances of the isolated error in this case have been noted in the majority opinion.

Contestee testified, as a matter of subjective state of mind, that his intent in reprinting the endorsement editorial was only to corroborate the central theme of his campaign that contestant had failed to vote on a substantial number of roll calls. Judge Breunig, selected by the parties themselves, who had the opportunity of hearing and observing this testimony as well as that of the other witnesses, believed this testimony. As an appellate court, we have no basis for discrediting testimony credited by the trial judge. It is doubtful that the legislature would, on this record, made in accordance with its own statute, have any rational basis for concluding otherwise.*

KELLY, Justice (dissenting in part and concurring in part).

I agree that there is no question of the legislature's final authority in this matter: it is an absolute grant of constitutional power which may not be delegated to or shared with the courts. It follows as pointed out by the majority opinion that we have no jurisdiction to issue a final and binding decision in this matter and any opinion rendered could only be advisory in nature.

As I interpret our constitution there is no duty imposed on this court to render any type of decision in this matter whether it be advisory or otherwise. I recognize that his court has as a matter of comity in some instances adhered to legislative enactments where it seems appropriate to do so. In this case it does not seem appropriate. Our constitution (Minn.Const. art. IV, § 6) provides:

"[That each house of the legislature] * * shall be the judge of the * * * eligibility of its own members."

Then, to aid the legislature to carry out its judicial role, the constitution authorizes that body to:

"[P]rescribe by law the manner for taking evidence in cases of contested seats in either house."

This language does not expressly or impliedly permit the legislature to obligate this court to make decisions in election contests where each house of the legislature is given the power of determining the eligibility of its members. It only goes so far as to permit the legislature to prescribe the manner for "taking evidence." Thus, the judiciary should not be required by the legislature to do more than take evidence. This court might be called upon to review the process involved in the taking of evidence.

An additional reason for my thinking that it is inappropriate for this court to render any type of decision in any manner affirming or reversing the court below is

---

**21.** This distinction was given judicial expression by a distinguished jurist, Sterry R. Waterman, United States Court of Appeals, Second Circuit, in *Goldwater v. Ginzburg*, 414 F.2d 324, in affirming a libel judgment for intentional falsehood published about Senatory Barry Goldwater in Fact Magazine during the Johnson-Goldwater presidential campaign. Judge Waterman, writing of "the highly charged atmosphere of a political campaign," observes that "it is not unlikely that emotional, biased and false statements may occasionally be made" and that "deadline pressures, editing errors, faulty research and partisan outlooks no doubt contributed to the publication of erroneous statements." (414 F.2d 335). But, he concluded: "As can be seen, appellee and the district judge did not rely on a few isolated instances of derogatory statements which could be charitably thought of as being nonactionable negligent or good faith misstatements of fact, but rather upon the totality of appellants' conduct, as evidenced by the proffered materials, from which a jury might reasonably find a predetermined and preconceived plan to malign the Senator's character." (414 F.2d 337.)

* Subsequent to release of today's advisory opinion, the House of Representatives on May 18, 1979, made a finding that contestee had committed a deliberate, serious, and material violation of the Fair Campaign Practices Act and that it was not committed in good faith. The vote was 67 DFL representatives in favor of that finding and 66 IR representatives opposed. (Contestee was by law excluded from voting on the issue.) Contestee's office was thereupon adjudged vacated.

that we would be intruding on the powers and duties of another branch of the government—the legislature.

I also have some misgivings about the constitutional propriety of the trial court making findings of fact and conclusions of law but because it is a one-man court, it seems less intrusive. That court perhaps should have done no more than take the evidence, state the issues, and summarize the testimony.

The majority opinion would to some degree modify the conclusion of the trial court which I not only think is inappropriate but is not what I would do if I opined that we had a constitutional duty to review the action of that court.

For the foregoing reasons, I join in the dissent of Mr. Justice PETERSON.